## DABNEY v. CHASE NAT. BANK OF CITY OF NEW YORK.

United States District Court
S. D. New York.
March 21, 1951.

Milbank, Tweed, Hope & Hadley, New York City, for defendant. A. Donald Mac-Kinnon, New York City, of counsel.

CONGER, District Judge.

This suit was tried to the Court without a jury upon two claims for relief.

The second amended complaint originally contained five claims (designated therein as "counts"), all of which were dismissed upon motions before me (first, third and fifth counts) and the late Judge Caffey second and fourth counts). An appeal by the plaintiff to the Court of Appeals for this Circuit resulted in the reinstatement of the second and fourth counts.[1]

It appears from the second amended complaint that on January 10, 1940, Associated Gas and Electric Company (hereinafter called "Ageco") filed its petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., in the United States District Court for the Northern District of New York, which petition was duly approved. On January 30, 1940, the proceeding was transferred to this Court. On October 16, 1940, Stanley Clarke was appointed trustee of the debtor, the order providing, among other things, that Clarke, as such trustee, was vested with title to the property of the debtor, with the usual powers of such trustee. By order of this Court, dated November 15, 1940, it was provided that the trustee have and exercise such additional powers as a receiver in equity would have if appointed for the property of the debtor.

At all times in question Ageco was a public utility holding company with securities outstanding in the hands of the public. Its assets consisted of securities of other holding companies, chiefly Associated Gas and Electric Corporation (hereinafter called "Agecorp") and its predecessor companies, which in turn held securities of other holding companies, and so on down the line to operating companies. All were component parts of a vast network of utility companies, holding companies, sub-hold-

Lewis M. Dabney, Jr., New York City, for plaintiff. Lewis M. Dabney, John A. Anderson, New York City, of counsel.

1. See Clarke v. Chase National Bank of City of New York, 2 Cir., 137 F.2d 797. The suit was commenced and prosecuted by Stanley Clarke as trustee, etc. who was replaced after trial by the present trustee; and the caption of the case has been changed accordingly.

ing companies, service companies, generally known as the Associated System and dominated by Howard C. Hopson who, with his associate, John I. Mange, controlled the voting stock of Ageco. Hopson, pursuant to agreement with Mange, had full control of all financial, accounting, corporate and legal business of the System.

On the dates of the two transactions complained of herein, defendant, a national bank, was indenture trustee for two issues of Ageco debentures, the 4½% Convertible Gold Debentures due January 15, 1949 (4½s of '49) and the Gold Debenture Bonds Consolidated Refunding 4½% due 1958 (4½s of '58).

On October 16, 1931 defendant made a $4,000,000 unsecured loan to Ageco due six months from date.

The loan was paid off in four installments, the last being in the sum of $2,950,000 on May 11, 1932. It is the recovery of this sum of $4,000,000 which is sought in the second count of the second amended complaint.

On August 28, 1934, the defendant consummated an agreement for the exchange of securities with four wholly owned subsidiary companies of Ageco[2] by transferring certain securities held by it in return for securities owned by the subsidiaries. Plaintiff, in the fourth count of the second amended complaint, seeks recovery of the proceeds of this exchange alleging the transfer to be unfair to the subsidiary companies.

Both of these transactions occurred, according to the second amended complaint, while Ageco was insolvent, or in imminent danger of insolvency, to the knowledge of the defendant.

In the course of the trial the plaintiff adduced testimony and offered exhibits relating to certain facts embraced in those counts of the second amended complaint which had been dismissed by the Court of Appeals. I permitted much of this testimony and received many of these exhibits solely to the extent that they bore upon the issues present in the second and fourth counts such as the good faith of the defendant and its knowledge of the financial condition of Ageco and its subsidiaries. I, undoubtedly, was somewhat liberal in my reception of evidence, but I felt that the Court, without a jury, should have the whole picture. Also, the Court of Appeals, Clarke v. Chase National Bank of City of New York, supra, in discussing Chase's position as a general creditor or subrogee in the event of a recovery in the suit, remarked that " * * * perhaps its (Chase's) behavior may be found to preclude either subrogation or participation as a general creditor" in the reorganization. 137 F.2d at page 801. At the date of the trial it appeared to me that some of the evidence might be pertinent in adjudging this "behavior."

At the beginning of 1932, the Associated System was faced with what has been described as a "pressing financial crisis." During the year 1932 the Associated System had maturities to meet of approximately $45,000,000 to $50,000,000 including $10,000,000 of Ageco loans. Revenues were decreasing while expenses were increasing. Credit was scarce. Negative pledge clauses in existing Ageco indentures precluded, or were intended to preclude, the issuance of debentures ranking ahead of those outstanding.

About this time Hopson conceived the idea of selling $40,000,000 of "Guaranteed 8s", which were to be Ageco debentures guaranteed by Associated Gas and Electric Corporation (Agecorp), a company to be formed by merger of Ageco's two direct subsidiaries, Associated Utilities Investing Corporation and Associated Properties, Inc. Agecorp's guaranty was intended to create the desired priority of the debentures, since System earnings had to pass through it before reaching Ageco. It was agreed that the Chase, Harris Forbes Corporation[3]

---

2. The second amended complaint so alleges. In fact, the exchange was made with direct subsidiaries of Agecorp. This point will be considered later.

3. The Chase, Harris Forbes Corporation was a wholly owned subsidiary of the Chase Securities Corporation. Shares of stock of the defendant and the Chase Securities Corporation were represented by a single certificate.

should assist in the marketing of these debentures and that defendant should be trustee under the indenture.

It was called to the attention of Love, one of the Vice Presidents of defendant and in charge of its Public Utility Department, that a large amount of debt was then owed to Ageco by its subsidiaries, Associated Utilities Investing Corporation and Associated Properties, Inc. Love's information was that as of December 31, 1932 the amounts were as follows: Notes Payable, about $665,000,000; Open Account Obligations, about $5,880,000.

Love then conveyed this information to Rushmore, Bisbee & Stern, attorneys for the prospective trustee, who were examining the proposed indenture. He expressed the thought of Aldrich, President of the defendant, that the lawyers should determine whether the proposed issue violated the indentures securing the Ageco debentures. The lawyers found that the issue did, in their opinion, violate negative pledge clauses in the existing indentures. Shortly thereafter and on March 11, 1932, the attorneys for Ageco were advised that Chase would not act as trustee of the Guaranteed 8s and would "take steps to obtain a judicial decree covering the question of a conflict between the provisions of the proposed 8% debenture issue and the covenants contained in the issues of which we are already trustee." The preparation of a complaint seeking such relief was commenced by defendant's attorneys.

On March 8, 1932, Ageco made a payment of $300,000 on its note to defendant, and made further payments of $300,000 and $450,000 on March 11th and March 14th respectively.

On March 15, 1932, a conference was held which was attended by Aldrich, Schley of the Bank, Mudge of Rushmore, Bisbee & Stern, Hopson and Proskauer, an attorney representing Associated. The recollection of Aldrich was that the conference was called to advise Ageco's representatives that defendant would take steps to prevent the issuance of the Associated Gas and Electric Company Guaranteed 8s because of the fact that they were guaranteed by the subsidiary company which fact Mudge had advised would be, in his opinion, a violation of the negative pledge clauses of the indenture under which defendant was trustee. This intention on the part of defendant had already been conveyed to Ageco's attorneys on March 11, 1932.

Beyond this recollection of Aldrich, the testimony is extremely vague as to what else took place at this conference. However, it was at least settled that the Guaranteed 8s would not be issued and there was some discussion of another type of indenture which could be legally issued. The evidence does not warrant a finding that at this conference it was decided to issue this new debenture, but shortly thereafter one was issued and sold to the public. This was a direct issue by Agecorp, known as the 8s of '40.

No objection was made to this issue by defendant. Aldrich testified that Mudge (the attorney for defendant) was of the opinion that any subsidiary corporation financing would not be prohibited by the terms of the indenture under which defendant was trustee.

The Chase, Harris Forbes Corporation did not take part in the sale of the 8s of '40 and the President, Addinsell, requested its representatives on the Ageco Board of Directors to resign.

By May 11, 1932, Ageco and Agecorp had received at least $4,000,000 in cash from sale of the 8s of '40. The plaintiff asserts that without the receipt of this cash, Ageco would have been unable to pay the balance due on the note, which it did on May 11, 1932 in the amount of $2,950,000.

It should be noted at this point that while certain exhibits put in evidence by plaintiff would seem to bear this out, yet no evidence before me would indicate that defendant's failure to object to the issuance of the 8s of '40 was in any way predicated on its desire to get its loan paid. It had objected to the issuance of the Guaranteed 8s on the advice of counsel. It consulted its attorneys as to the legality of the 8s of '40 and following their advice did nothing about the issuance of these debentures.

It should be noted, too, that during this period Ageco paid off bank indebtedness including that of defendant in the amount of nearly $6,000,000.

I have related briefly the circumstances leading up to the payment of the note of $4,000,000 to Chase. Many of the facts deal with the issuance of the 8s of '40, a subject rendered extraneous the scope of this suit under the decision of the Court of Appeals. However, their value lies in the extent to which they may have given knowledge of the condition of Ageco to Chase, or, as I stated before, to the extent that they aid in appraising Chase's "behavior" in the matter.

I shall state the facts in connection with the exchange of securities (fourth count) in the same manner, referring, for background purposes or for other purposes germane to this claim, to the so-called Recap Plan, upon which the plaintiff had based a grievance in the excluded third count of the second amended complaint.

About $10,000,000 of the 8s of '40 were sold.

On May 15, 1933, Hopson announced a "Plan of Rearrangement of Capitalization" (Recap) under which holders of Ageco debentures were urged to deposit them in accordance with three optional exchanges.

In this letter, Hopson painted a rather dark picture. He complained of a substantial decline in earnings, slow collections, higher taxes, reduction in rates. He called attention to the materially lessened use of electricity and gas for industrial and commercial purposes. He also called attention to the lack of capital and the absence of a dependable bond market. The letter also stated that "While the Company may be able to meet debenture interest if general conditions do not become decidedly worse, the dangers of fixed interest securities in times like these are becoming more and more apparent. Receiverships and forced reorganizations, with all their attendant expenses, discontinuances of all interest payments and loss of operating efficiency, with delays and contests of rival committees, must necessarily follow if fixed interest charges are not met."

At the time of the initiation of the so-called Recap Plan, defendant owned $4,249,000 in principal amount of 4½s of '49, one of the issues for which it was trustee. Burroughs, Hopson's chief financial man, tried to interest Love in exchanging these under the Plan, but Love refused for several reasons among which was that there was not "* * * sufficient incentive from the standpoint of a debenture holder to warrant his consent to permanent relinquishment of his contract rights * * *."

In the latter part of 1933 the defendant consulted its attorneys as to what attitude defendant should take toward the Recap Plan. During December, 1933 and January, 1934, Bennett and other persons of the law firm of Milbank, Tweed & Hope, gave consideration to the legality of the Recap Plan. Bennett discussed with Love the advisability of legal action against the Plan. He concluded that the bank should not litigate, but should not deposit, and should make its stand known to anyone inquiring about it. He so informed Love and Aldrich. Counsel was of the opinion that any suit that might be brought would probably be unsuccessful; that there were several courses open, one of which was bankruptcy, but counsel felt that there was no cause for bankruptcy; and that they had no case to enjoin the Recap Plan on any ground.

Sometime between the Fall of 1933 and June 1934, Love suggested to Burroughs that Associated purchase certain notes of Municipal Service Company, an Insull subsidiary, which were owned by Central Eastern Power Company, another Insull Company. It had become apparent to Love sometime in 1933 that the Bank would eventually acquire these notes by virtue of a claim which it had against the latter company, and Love thought that Associated was the logical purchaser since the properties of some of the Municipal Service subsidiaries would fit in with some of the Associated's Pennsylvania properties. The Associated people were interested. A price was mentioned of $700,000 to $800,000 and Love and Burroughs more or less "jelled" at this price. Negotiations had gotten along fairly well when Burroughs suggested that

the deal be broadened to include an exchange of $4,249,000 in principal amount of Ageco 4½s of '49 debentures held by defendant.

During this period Associated through Burroughs was continually asking defendant to deposit under the Recap Plan.

Under the deal as finally consummated pursuant to contract of August 28, 1934, Chase delivered the following securities:

$4,249,000 principal amount Ageco 4½s of '49

3,899,635.22 Demand Notes of Municipal Service Company

19,554 Shares of no par common stock of Municipal Service Company

In return Chase received the following securities:

$4,000,000 principal amount of Associated Electic Company 4½s of '53

52,000 principal amount of Pennsylvania Electic Gold Bonds due 1962

The plaintiff asserts that this exchange was unfair to the Ageco subsidiaries[4] to the extent of some $1,600,000 or more according to his calculations.

The main issues that present themselves are these:

1. Was Ageco on or about March 31, 1932 insolvent or in imminent danger of insolvency? (Second count.)

2. If decided in the affirmative, then, did defendant have knowledge or notice of, or was it put on inquiry as to Ageco's insolvency or imminent danger of insolvency?

3. Was Ageco on or about August 31, 1934 insolvent or in imminent danger of insolvency? (Fourth count.)

4. Did defendant have knowledge or notice, or was it put on inquiry as to Ageco's insolvency or imminent danger of insolvency? (Fourth count.)

5. Assuming that the last two issues are resolved in the affirmative, was the exchange of securities of August 28, 1934 unfair to Ageco?

Initially, I think it proper to dispose of certain objections made early in the trial of this cause upon which decision was reserved. Those objections relate to New York statutes of limitations, which, the defendant asserts, are a complete bar to this suit.

I confess that I have always been somewhat in a quandry as to the true nature of these claims. It was simple enough to try the suit according to the issues as they appeared in the opinion of the Court of Appeals. But when it becomes necessary to consider the claims in their proper light in order to apply the statutes of limitations to them, I am presented with what I regard as a novel problem.

There is no doubt that the claims are state-created rights and that the New York State statutes of limitations apply to them. Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079; 48 Columbia L. Rev. 576. But which state statutes are the applicable ones?

The defendant relies on Section 48(3) of the Civil Practice Act which provided, prior to September 1, 1936, that "An action to recover damages for an injury to property, or a personal injury, except in a case where a different period is expressly prescribed in this article" shall be commenced within six years after the cause of action has accrued. The plaintiff urges Section 53 of the Civil Practice Act which provides that "An action, the limitation of which is not specifically prescribed in this article, must be commenced within ten years after the cause of action accrues."

If the defendant were to prevail, it is apparent that the claim for relief involving the 1932 transaction would have been barred in 1938 while the claim for relief arising out of the 1934 transaction would have been barred in 1940, unless with respect to the latter claim, the plaintiff may have the benefit of the extension found in Section 11, sub. e, of the Bankruptcy Act, 11 U.S.C.A. § 29, sub. e, by reason of the filing of the petition for reorganization on January 10, 1940. The suit was commenced on January 10, 1942. Of course, if the plaintiff were to prevail in his contention, the claims were not barred.

4. See footnote 2.

A preliminary analysis may be helpful in arriving at some conclusion. In the first place, let it be clearly understood that these claims are not creatures of the Bankruptcy Act. In other words, they do not involve the rather common bankruptcy suit for the return of preferential payments, nor for the avoidance of a fraudulent conveyance. Neither are they claims which the debtor or creditors could have instituted prior to bankruptcy, nor are they claims arising out of transactions between the trustee and third persons.

In the second place, the debenture holders would have individual claims against the defendant for breach of trust, assuming, of course, the other allegations of the complaint to be true. But the debenture holders would have no standing to sue for restitution to the estate.

It would appear, therefore, superficially, that the trustee is not enforcing any rights of his own but rather those belonging to the debenture holders. If that were so, the trustee would be in effect an assignee and would be subject to the limitations imposed upon the debenture holders in any such suit. But it evidently is not so. The Court of Appeals said: "For this reason we believe that any funds recovered would be so far related to the proposed reorganization as to necessitate their inclusion within the 'extended meaning of the debtor's property,' * * * and to authorize the trustee to reduce the fund to possession and hold it for such disposition as may be found to be proper." Clarke v. Chase National Bank of City of New York, supra, 137 F.2d at page 801.

From that I would gather that the trustee is suing in behalf of the estate and not for the debenture holders, even though the defendant had obligations only to the debenture holders and none to the estate.

█ I can only conclude, then, that Section 53 of the Civil Practice Act is applicable since I can find no other " * * * limitation * * * specifically prescribed * * *" for such an action.

Section 48(3) could not be applicable because of the absence of a trust res to in-jure, unless it might be said that the defendant injured the property of Ageco.

The defendant's motion to dismiss upon the ground that the claims for relief herein are barred by the statute of limitations is denied. I hold that neither claim for relief herein was barred by the statutes of limitations.

█ Insolvency admits of several definitions. There is one which defines insolvency as a present inability to meet obligations as they mature. See Bouvier's Law Dictionary, Rawle's 3rd Rev., page 1601. This has been generally classified as insolvency in the equity sense. Finn v. Meighan, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624. Under Section 1(19) of the Bankruptcy Act [5] insolvency results when the aggregate of a debtor's property is not sufficient at "fair valuation" to pay his debts.

The circumstances of the present suit and the nature thereof require that such a concept of insolvency as found in the Bankruptcy Act be applied. The plaintiff has proceeded in accordance with such definition and the defendant has partially acquiesced by the manner in which it approached the problem. However, for the defendant's protection and by reason of the fact that it has urged the rejection of any bankruptcy concepts in approaching the problem, I feel that I should indicate at this time that Ageco was not in formal bankruptcy in 1932 and 1934 and that it appears that Ageco met its obligations as they matured until and including the crucial dates in suit, in fact until 1940. In fairness it should also be added that plaintiff never contended that Ageco in 1932 and/or in 1934 was insolvent in the equity sense.

The plaintiff earnestly contends that "The most favorable standard of value which could possibly be applied to a trustee who competes with his *cestui* in collecting a debt from a common debtor, alleged to be insolvent, is the test which would be applied in a suit by a trustee in bankruptcy to recover a preference from one, not a fiduciary, who had collected his debt within four months of the filing of the petition."

5. 11 U.S.C.A. § 1(19).

It is true here that the issue of insolvency depends upon a fair valuation of Ageco's property. But "fair valuation" is an expression diverse in meaning, depending for definition upon the circumstances to which it is applied. A property such as the one in suit may be fairly valued for rate making, taxation, upset-price fixation, reorganization capitalization, condemnation and other purposes, and the concepts of value will not necessarily be univocal in each case.[6]

"Fair valuation" under the Bankruptcy Act " * * * involves a value that can be made available for payment of debts within a reasonable period of time." Syracuse Engineering Co. v. Haight, 2 Cir., 1940, 110 F.2d 468, 471. And this is so because the concept is influenced by the expedient of satisfying the demands of impatient creditors. But should such a standard be used in valuing an enterprise which, at the valuation dates, was a going concern and not, so far as might be superficially ascertained by a retroactive judgment, exclusive of handsight, an expiring estate being prepared for interment? I submit that the answer must be in the negative. The proper standard is that fair valuation of a going concern which an informed willing seller under no compulsion to sell and an informed willing buyer not pressed for an immediate return would attribute to the property. In general, this standard was used by the parties here with certain refinements and adaptations considered necessary.

Any departure from this basic standard lies in the respective methods of applying it. I make this clear because I perceive that the lawsuit would be ended upon rejection of the foregoing argument of plaintiff's counsel. There is no evidence, however, that plaintiff's expert was instructed to apply a bankruptcy standard, but there is evidence that his work was circumscribed by plaintiff's counsel. The argument, therefore, is an attempt to support the product of plaintiff's expert in following counsel's instructions. Nevertheless, I feel that plaintiff's expert and defendant's, too, proceeded initially upon proper standards. Wherein their methods differ will become apparent in the course of this opinion.

Simply viewed, this lawsuit is nothing more than a battle of expert appraisers whose reports on the value of the System at the crucial dates are fantastically divergent. One finds the System insolvent by a wide margin, while the other finds it comfortably solvent. To add to the fantasy, the appraisals were made eleven to thirteen years after the pertinent dates. In other words, the experts took a present view of the past events and treated them as though the present had not yet arrived.[7]

The plaintiff's expert on the subject of valuation was Jay Samuel Hartt of Chicago. Hartt is a consulting engineer with a degree in electrical engineering and is a member of many professional societies. From 1915, when he graduated from Michigan State College, to 1917, he was employed by the American Public Utilities Company of Grand Rapids, Michigan as a resident engineer in the construction of a 4100kw. steam electric generating plant, as a resident engineer in the construction of a central station hot water heating plant and distributing system, and as an assistant superintendent of a gas plant, all at La Crosse, Wisconsin. From 1917 to 1919, he was in charge of the inspection of construction materials, the approving of invoices for such materials, and some cost accounting for the Quartermasters' Corps of the U. S. Army in various projects. From 1919 to 1924 he was employed by, and later became a partner of, Byron T. Gifford, Consulting Engineer, with offices at Grand Rapids, Michigan, and Madison, Wisconsin, and from 1920 to 1924, rendered services in connection with public utility valuations, public utility rate cases, public utility design, supervision and construction, bond reports, reports for purchase and financing of utilities and industrial valuations. From 1924 to date he has been in business as an individual consulting engineer rendering services in connection with reorganizations under section 77B, Bankr.Act, 11 U.S.C.A.

6. See Bonbright, Valuation of Property, Vol. I, p. 4.

7. There is a dispute in connection with the plaintiff's use of present events, or hindsight, in his appraisal. It will be dealt with hereafter.

§ 207, voluntary reorganizations, restatement of capital, public utility valuations, common carrier valuations, industrial valuations, natural gas studies, public utility financing, certificates to indenture trustees, reports for purchase or sale, market analyses, public utility rate cases, utility operating surveys, tax cases, municipal condemnation, original cost studies, depreciation studies, water power studies, diesel engine reports and public utility construction. He has conducted field activities in all the States in the United States, in four of the Provinces of Canada, in Mexico, Haiti, Puerto Rico and the Dominican Republic. He has valued properties in the Philippine Islands and in the Spanish possessions of Mallorca and the Canary Islands. His clients have included many important utilities, municipalities, governmental agencies and financial institutions.

Between 1915–1917 he was employed by American Utilities Company which had to do with the operation of a gas property. He operated telephone properties that were in bankruptcy. Since 1938 he has been co-trustee of Midlands Utilities Company and part of his work was to look after the operation of various companies of that estate as well as to make valuations for the purpose of reorganizations, and look after the financing of the properties. He was engineering advisor to the trustee of Utilities Power and Light Corporation. During his career he has been engaged in over 150 rate cases.

Just prior to the War his organization consisted of about 100 employees, most of whom were engineers.

Hartt found a "fair value" which would be paid by a willing buyer to a willing seller within six months of his valuation dates.

He said that "It is the amount which a willing buyer would be willing to pay if such a buyer were well informed of the assets, liabilities, financial condition and business possibilities of the company issuing such security, were well acquainted with the territory in which the company operated and were not pressed for an immediate return of his investment; likewise, it is the amount which a willing seller in a similar financial position and possessed

of similar facts would be willing to accept in payment." He testified that he had in mind a sale on an arm's length basis in the reasonably prospective future, which would be a matter of approximately six months. He limited the reasonably expected gross income to that which might be attained within a period of six months even though he normally would look three years into the future in considering reasonably prospective gross income in such cases. Hartt could not recall another case in which such factor was confined to so short a period; and he treated it in such fashion in this case upon the instruction of counsel.

Having in mind, then, Hartt's theory of fair value, I proceed to the mechanics and actualities of his appraisal. Generally, he used accepted methods in his treatment. He valued the System operating companies separately by capitalizing their gross income, exclusive of income from investments in affiliates.

His capitalization rates were based on gross income capitalization rates of so-called "yardstick companies", which were independent operating companies in various parts of the country selected as a guide for the task. In arriving at gross income he adjusted depreciation in order to comply with current practice in the industry. He adjusted the capitalized value for current position. He valued the operating companies exclusive of their investments in securities of affiliated companies and valued these securities separately on the basis of the capitalized value of other operating companies on which they were based. From the total resulting value, he deducted senior securities and arrived at a value for the common stocks of operating companies. He translated this value upward through the holding company pyramid, deducting the face amount of publicly held senior securities and apportioning the proper share of value to the publicly held equity where the System did not own the entire equity. In capitalizing operating company gross income, exclusive of income from investments in affiliates, Hartt used the income for the latest twelve month period prior to each of the pertinent dates and rates of capitalization in line with existing gross

income capitalization rates of his yardstick companies. Thus he obtained substantially a fair value reflecting the market level and the immediate past income as of the two dates in question or a so-called "spot" value.

As of March 31, 1932, Hartt found the fair value of Ageco's assets to be $284,597,007 and as of August 31, 1934, he found the fair value to be $56,050,803. Both of these figures purport to be substantially less than Ageco's liabilities at the respective dates. I shall, therefore, consider initially Hartt's valuation before discussing Ageco's liabilities at those times.

Hartt set down his conclusions as follows:

Associated Gas and Electric Company (N. Y.)

| | March 31, 1932 | Pro-Forma<br>August 31, 1934 |
|---|---|---|
| Capitalized Value | $    — | $    — |
| Add—Current Assets (excluding Materials and Supplies) | 4,368,891 | 577,475 |
| Deduct—Current Liabilities | (1,926,302) | (309,315) |
| Capital Value Adjusted | 2,442,589 | 268,160 |
| **Investments in Affiliated Companies** | | |
| Associated Gas and Electric Corporation (Del.) | | |
| Accounts Receiveable—$18,930 | | 18,930 |
| Convertible Obligations—$300,000,000 | 266,392,851 | |
| Common Stock—3,710,000 Shares }<br>6,710,000 Shares } | | 32,978,652 |
| Eastern Utilities Securities Corporation (Del.) | | |
| Accounts Receivable        $ 7,227,287 | | |
| Convertible Obligations, 6%     42,330,000 | | 1,701,186 |
| Convertible Obligations, 5%      9,500,000 | | |
| Common Stock—6,000 shares | | 0 |
| Associated Electric Company | | |
| Bonds, 4½%, 1953—$4,435,000 Par | 4,435,000 | |
| Bonds, 4½%, 1956    1,980,400 Par | 1,980,400 | |
| Bonds, 5%,    1961      143,000 Par | 143,000 | |
| Erie Lighting Company | | |
| Bonds, 5%, 1967    $1,061,000 Par | 1,061,000 | |
| Northern Pennsylvania Power Company | | |
| Bonds, 5%, 1956    $1,040,300 Par | 1,040,300 | |
| Total Investments in Affiliated Companies | $275,052,551 | $34,698,768 |
| Total Assets | $277,495,140 | $34,966,928 |

( )—Denotes Red Figures

In the course of his testimony, Hartt added to the March 31, 1932 valuation $3,400,000 on account of a tax adjustment and $3,701,867 as additional "hindsight" value based on later sales of 28 companies with no gross income in 1932 and to which he had ascribed no capitalized value. He also added to the August 31, 1934 valuation $4,583,875 of "hindsight" value based on later sales of 28 companies without gross income to which he had ascribed no capitalized value and $16,500,000 by reason of the fact that excluding holding companies from his yardstick companies in 1934 would have reduced the gross income capitalization rates by approximately ¼%.

Hartt's basic value depends upon the value of the securities of the operating companies in the System, which values, as stated before, were translated upward through the holding company pyramid to Ageco. Hartt's "yardstick" companies were used in this process. He prepared a tabulation showing market price earnings ratios and annual allowance for depreciation at the crucial dates in connection with each of the "yardstick" companies, 18 in all. His market prices for the common stock of these companies were obtained from the Commercial and Financial Chronicle and represented the average of the low and high for the weeks ending April 1, 1932 and August 31, 1934. Bond and note levels were taken at par and preferred stock at par or liquidating value. The earnings and depreciation were taken from Moody's Manual of public utilities for the 12 months ended December 31, 1931 and for the 12 months ended December 31, 1933, the nearest dates readily obtainable for the valuation dates. The next step was to divide the aggregate of bonds and preferred stock plus the market price of the common stock by the gross income to arrive at the times earnings. In other words, the times earnings figure represents the multiplier of gross income by which capital is reflected. And the reciprocal of times earnings is the capitalization rate.

His annual allowance for depreciation was expressed in percentages of property and plant and in gross revenues, which percentages were arrived at by dividing the annual expense of depreciation by the book value of the property and plant and by dividing annual expense of depreciation by the gross revenue respectively. He figured depreciation on the two different basis because in 1932 and 1934 the property and plant of utilities was stated on various bases, and he felt that such basis was not certain for checking the annual expense of depreciation. He included, therefore, the percentage that the annual expense bore to gross revenues as a second check. He said it was generally conceded that the latter test was better in most instances than was a percentage of property where the make-up of the property account was not

known. The percentage of gross revenue that Hartt took for depreciation by the "yardstick" companies on a weighted average at March 31, 1932 was 8.46% and at August 31, 1934 was 9.79%.

Having the "yardstick" tabulations to guide him, Hartt took up the value of the operating companies. With respect to those he ascertained from their books gross income, fixed charges, debt discount and expense, net income and annual allowance for depreciation for all the years from 1929 to 1934 inclusive, interposing the figures for March 31, 1932 and August 31, 1934. He then recast these figures so as to arrive at gross income less income from affiliated investments and before annual expense of depreciation. Affiliated investments were deducted because of separate evaluation at some other point in the appraisal. Annual allowance for depreciation was excluded because of material variance in the companies' allowances from year to year. Hartt then adjusted the companies' annual allowances for depreciation for March 31, 1932 and August 31, 1934 upward or downward according to his judgment of what it should have been. These adjustments brought the depreciation figures more in line with the percentages ascertained from the "yardstick" companies. His judgment also involved a consideration of the depreciation reserve of each company, whether it was high or low, and a computation of depreciation reserve on a straight-line basis as another consideration.

Having fixed the depreciation for the various companies at the two dates in question, he deducted such depreciation from the book figure of gross income less income from affiliated investments and before annual allowance for depreciation and arrived at such income with the depreciation adjustments included. The latter figure represented what the company might be expected to earn in the ensuing year. He adjusted for Federal income tax where necessary and finally capitalized the adjusted gross income at a rate which he judged proper, resulting in the capitalized value of physical property after deducting working capital. In assigning his capitalization

rates, he considered whether the earnings of a company were subject to regulation by a public service commission, its location, the character of its operation, especially the percentage of its revenues produced by various types of utilities, the capital structure of the company, the amount of the depreciation reserve and all other facts that he could learn. The capitalized value of the physical property was then translated into security value for each of the companies by adding current assets (excluding materials and supplies) and investments in affiliated companies and by deducting current liabilities and senior obligations.

The defendant's criticisms of the Hartt valuations are many.

Hartt found "spot values" for Ageco's assets as of March 31, 1932 and as of August 31, 1934. Of course, if values are to be found for two specific dates they must necessarily be "spot values." But is it proper in a project of this kind to base "spot values" on figures approximating the "spot?" Hartt's "yardstick" figures, which he used as a guide in formulating his opinion as to the capitalization rates for the operating companies, were developed from the average market prices for common stocks of a number of companies for just two weekly periods, the week ending April 1, 1932 and the week ending August 31, 1934. His earnings for the Ageco operating companies represented the twelve months ending March 31, 1932 and August 31, 1934; and he considered these figures as the reasonably prospective gross income figures.

Obviously, a prospective seller and a prospective purchaser would wish to be better informed than Hartt's figures would leave them. Rather, the parties would be interested in knowing the past record of the companies for a reasonable time, having in mind the possibility of attaining such figures in the future; they would look to the reasonable future to ascertain business prospects, and would give that factor consideration. They would recognize that the "spot" market prices and "spot" earnings were depressed compared to the past and would seek to ascertain within reason whether such prices and earnings were temporary or of long duration. In fact, Hartt testified that he would have required better information than he supplied were he the party to such a deal, and he normally gave it to his clients when he approached such a venture.

Hartt testified as follows:

"Q. Would a willing buyer and a willing seller only look at one week's stock market prices in 1932 and 1934? A. No, I think he would probably look at more than that.

"Q. Would you recommend a buyer who engaged you to advise him to look at one week's prices; the buyer of a utility property? A. No, sir.

"Q. One week's market prices? A. That is right.

"Q. You would want a much longer range, would you not? A. I would look at a longer range. Yes, sir.

"Q. You would take into consideration, would you not the conditions that existed in 1932? A. I would."

He never gave a great deal of consideration to capitalization rates based on "spot" market prices in other valuations and was unable to recall any arm's length sales of utilities in 1932 and 1934 made on that basis. His reasonably prospective gross income for the dates in question was merely the most recent past gross income with his adjustments. In other cases, his reasonably prospective gross income, he testified, would be influenced by the potentialities and probabilities three years in the future.

It is plain that Hartt has departed from his normal methods in confining his investigations to such a narrow field, and his report is tainted superficially, at least, by such circumscription. His reason for such departure rests on the instructions given him by plaintiff's counsel who has insisted all along that the standard of value prevailing under the Bankruptcy Act is proper. I have indicated before that I reject such standard in the present situation. Ageco was a "going concern" in 1932 and 1934, and I believe it should be treated on such basis.

A saving feature develops, however, from the fact that Hartt's earnings as at March

31, 1932 seem higher than a projection of three years into the future would show. It appears undisputed that the trend of earnings was downward at that time. And although a slight increase might properly have been projected from August 31, 1934, it appears that the three-year trend was generally downward.

Hartt is criticized for his ignorance with respect to his "yardstick" companies. He admitted that he made no study of them other than the mechanical process of obtaining their capitalization rates and depreciation percentages.

Hartt was rather vague in his attempt to pick out from his "yardstick" companies those which were holding companies. He did pick out some others he was not sure of. I think this arose because Hartt had instructed his assistant to get him a list of operating companies—"companies" which were freely traded in in 1932. His assistant furnished him a list of 18 companies. It is rather apparent that Hartt thought at the outset that these were operating companies. He did not know the percentage of depreciable property in the "yardstick" companies, or whether they used straight line or retirement reserve methods of depreciation. He made no study of the maintenance figures of his "yardstick" companies even though he knew that there is a definite relationship between maintenance and depreciation. He assumed that the Ageco operating companies were adequately maintained and adjusted the depreciation accordingly.

After having been apprised in the course of his cross-examination that his "yardstick" companies contained holding companies, and even though he considered that such holding companies were the same as operating companies because their holdings consisted only of the common stock of a closely knit group of operating companies, Hartt prepared a schedule showing that the exclusion of all holding companies from the "yardstick" companies made no difference in the weighted average of the gross income capitalization ratio in 1932 and reduced the weighted average approximately $\frac{1}{4}\%$ in 1934. The result of such a reduction in

1934 increased the value of Ageco some $16,500,000, which Hartt added to his value.

Hartt is further criticized for failing to give any capitalized value to 55 companies which had no gross income from operations. Of course, if capitalization of income is a proper method of valuation, there can be no capitalized value if income is absent. Hartt did give some value applicable to the current assets and investments of the companies. The real fault again lies in Hartt's restricted treatment of the company values in accordance with plaintiff's counsel's theory of value. It results in the phenomenon of the willing seller, *under no compulsion to sell,* gratuitously disposing of the property after a glance at the latest income figures which are red. This could never happen unless the willing seller were informed that the business potentialities for the future were so negative that it profited him to unload while he remained whole. Hartt's appraisal would not give him this information since he projected no further than the most recent income. And likewise a willing buyer, *not pressed for an immediate return* would seek a broader view of the property than the latest income figures. In fact the figures Hartt used would presumably send a buyer elsewhere unless he sought the salvage value of the property. He would certainly look for a forecast of the future possibilities of the property rather than judge on the basis of the gloomy income figures. And he would be pleased to know the reasonable history of the property, although I suppose he would rather that it not be taken into consideration in the price since it indicated better times in the past. On cross-examination it was pointed out to Hartt that many staunch properties, for example, Bethlehem Steel Company, Allis Chalmers Corporation, Anaconda Copper Corporation and others, would not according to his methods, have had any value for their fixed assets around the dates of his appraisal since they had no gross income in those years. Hartt said, however, that he would have taken into account the physical plant and property of those companies althought he did not do it for Ageco companies for those years in which they had no gross income, and there were approxi-

mately 50 Ageco companies of this character. Subsequently, Hartt prepared an exhibit on the 55 companies to demonstrate the trivial amount of value involved. He found that 28 of the companies had been sold since 1934 and he gave these companies a value equal to the sales price discounted by 6% a year for the time elapsed between the respective valuation dates and the date of sale. The value so derived was $4,342,-746[8] as of March 31, 1932 and $4,946,635 as of August 31, 1934, both figures representing increases over Hartt's original value. Of course it is obvious that these figures are sheer hindsight and admittedly so, and Hartt conceded that his discount in reverse method was unique. Of the remaining 27 companies, 7 were service companies and investment companies which had no plant or property and which had substantial operating losses at the valuation dates. The other 20 companies were miscellaneous companies having an aggregate plant of approximately $1,000,000 at both dates and were given no value. He testified that these were too small to bother with although he later admitted that Dedham and Hyde Park Gas and Electric Light Co. was anything but an insignificant company.

I have set forth substantially all of Hartt's appraisals and defendant's criticisms. I shall advert to both hereinafter, but I believe it to be judicious to compare at this time Hartt's values with the liabilities of Ageco at the valuation dates.

There is no dispute between the parties as to the amounts of Ageco's debt outstanding per books on March 31, 1932 and August 31, 1934. They do dispute the classification of certain items of the debt, however.

Hartt set forth the liabilities on the two dates as follows:

### March 31, 1932

| Security | Amount Outstanding |
| --- | --- |
| Unsubordinated debt: | |
| Funded Debt (including debentures and Interest Bearing Allotment Certificates) | $251,262,980 |
| Secured Bank notes | 1,378,766 |

8. From this figure and the figure for August 31, 1934, were deducted amounts previously assigned arriving at $3,701,867

| | |
| --- | --- |
| Bank Notes | $ 4,890,000 |
| Accrued Interest | 4,042,824 |
| Matured Interest Unpaid | 224,958 |
| Interest Bearing Allotment Certificates—depository account | 795,649 |
| Payments received on bond subscriptions | 1,285,681 |
| CDCs—various series | 37,905,997 |
| Payments received on subscriptions—CDCs | 173,433 |
| Total Senior Obligations | $301,960,558 |
| Subordinated debt: | |
| Convertible Certificates | $ 3,398,800 |
| Convertible Obligations | 42,166,400 |
| Accrued Interest | 299,722 |
| Matured Interest | 150 |
| Total Subordinated Debt | $ 45,865,072 |

### August 31, 1934

| | |
| --- | --- |
| Total unsubordinated debt (consisting of various issues of debentures, interest bearing script due 1937 and 1938, and accrued interest) | $133,399,543 |
| Subordinated debt | |
| COABs | $ 93,212,232 |
| Accrued unpaid interest on COs (COABs) | 6,539,650 |
| CDCs—6% B (old) | 57,700 |
| Accrued interest | 6,540 |
| Matured interest | 12,930 |
| Total subordinated debt | $ 99,829,052 |

Hartt's judgment is not reflected in the classification of the debt. The ranking depends upon counsel's instructions which ranking is seriously disputed by the defendant.

The facts respecting the terms of the Ageco debt are contained in an elaborate stipulation signed by the parties.

It is therein stipulated among other things as follows:

### March 31, 1932

| | |
| --- | --- |
| Ageco's funded debt, including Interest Bearing Allotment Certificates | $253,038,931 |
| Principal amount of Ageco's convertible securities then outstanding | 84,440,278 |

### August 31, 1934

| | |
| --- | --- |
| Ageco's funded debt | 131,528,796 |
| Principal amount of Ageco's convertible securities then outstanding | 93,269,932 |

The defendant asserts that the Interest Bearing Allotment Certificates (IBACs) which were classified as funded debt by the company in reality were convertible ob-

for March 31, 1932 and $4,583,875 for August 31, 1934.

ligations and should have been so classified by the company. On March 31, 1932, according to the stipulation there remained some $13,179,630 worth of $8 IBACs and $1.60 IBACs outstanding, which sum subtracted from the funded debt would have reduced it and the unsubordinated debt accordingly. However, the company properly treated the IBACs as funded debt for the reason that while the company had an option to convert these certificates into various classes of stock, the holder had a counter-option to demand Ageco debentures.

The plaintiff also classified various issues of Convertible Debenture Certificates (CDCs) as unsubordinated debt on March 31, 1932, and the defendant seriously disputes the classification, contending that these securities more nearly approximated stock than evidence of indebtedness, and should, therefore, be relegated to the class of subordinated debt.

The classification of convertible obligations was the subject matter of special litigation in Ageco's reorganization proceedings. In re Associated Gas & Electric Corp., D.C.S.D.N.Y.1943, 53 F.Supp. 107; In re Associated Gas & Electric Co., D.C. S.D.N.Y.1943, 53 F.Supp. 118; Elias v. Clarke, 2 Cir., 1944, 143 F.2d 640. The Honorable Frederick E. Crane, Special Master appointed by Judge Leibell in the Chapter X proceeding to determine the status of the junior debt of Ageco, held that the holders of one issue of CDCs were unsubordinated general creditors of Ageco. His findings of fact and conclusions of law on this point were not reviewed by Judge Leibell, nor by the Court of Appeals for this Circuit because the rights of the so-called junior creditors of Ageco were settled in an overall compromise between the creditors of Ageco and Agecorp. However, defendant seriously challenges Judge Crane's holding. There is much to be said in favor of defendant's argument. I shall pass the point at this time, however, keeping in mind that the unsubordinated debt of Ageco as of March 31, 1932 is subject to reduction to the extent of some $37,000,000 of CDCs outstanding at that time, depending upon their proper rank.

The same amount of CDCs may be of concern with respect to the liabilities of Ageco on August 31, 1934. All of the CDCs of various series were convertible into specified classes of Ageco stock at the option of the company. In May, 1932, the company notified the holders of the CDCs that it had determined to convert these issues into various shares of preferred and preference stock on June 15, 1932, but that the company was granting them the option to take instead a new series of Convertible Obligations called Convertible Obligations of 2002, Series A and B (COABs) which were subordinate by their terms to the senior obligations of Ageco. The principal issue in the litigation in the Ageco Chapter X proceeding concerned the validity of the purported conversion of the CDCs into preferred stock and into COABs. Of course this issue is not involved in the second cause of action herein, for the purported conversion was not effective until June 15, 1932, some months after the last payment on the loan had been made to Chase. But it may be significant in connection with the fourth cause of action, assuming that the CDCs prior to conversion were unsubordinated. The plaintiff has included the CDCs along with the COABs under subordinated debt, suggesting that the ranking of the debt is unrelated to the issue of insolvency, which he deems the underlying basis of Chase's liability. Whether that is so or not may be considered later along with the ranking of the CDCs on March 31, 1932. Suffice it to say now that the unsubordinated and subordinated liabilities on the two dates are subject to variance to the extent of $37,000,000. Otherwise the liabilities are fixed.

As I have indicated before, Hartt found total values for the assets of Ageco of $284,597,007 as of March 31, 1932 and $56,050,803 as of August 31, 1934.

Giving full credence to the accuracy of his appraisal, one may plainly see that Ageco was insolvent by a substantial margin at the two dates in question. Further, one may observe that Ageco's unsubordinated debt exceeded its assets at the same time, although a determination that the

CDCs were not properly unsubordinated debt would reduce that item some $37,000,000 and would result in an excess of assets over unsubordinated debt on March 31, 1932.

The plaintiff sought to confirm Hartt's demonstration of insolvency by various independent lines of testimony. Exhibits were prepared purporting to reflect the market values of Ageco's securities on a consolidated basis at March 31, 1932, June 30, 1933 and August 31, 1934. The valuation of Ageco's assets thus obtained by the so-called "stock and bond method" i. e. by aggregating the market value of the various classes of securities and by adding short term debt at par, was as follows:

| | |
|---|---|
| March 31, 1932 | $121,854,077 |
| June 30, 1933 | 63,895,431 |
| August 31, 1934 | 33,188,949 |

Obviously, these figures tend to confirm Hartt's demonstration of insolvency. In fact they suggest that Hartt was excessively over-generous in his conclusions. But exactly what weight should be given to the method?

The market quotations were obtained from sources recording such figures. They represented quotations of a single day, and in cases where no market quotations were available, the available quotations for the day nearest the dates in suit were used.

Ross, an employee of Ageco who prepared the exhibits in connection with the security market, knew that market prices were low in 1932, somewhat higher in 1933 and 1934. He knew that the President of the United States had declared a bank holiday in 1933; and he recalled reading the instructions issued by the Controller of the Currency to national bank examiners to disregard the market prices of securities in making their examinations.

Hartt was aware that in December, 1931, the Controller of the Currency had advised bank examiners that the collapse in market securities had reduced quoted prices even for sound bonds to distress levels and out of any relation to intrinsic values; that state insurance commissioners were advising insurance companies to value their securities on basis other than the market values in 1931 and 1932; that market values were substantially out of line with real values in the depression years and that in 1932 and 1934 market prices did not reflect sound or intrinsic values.

Plaintiff's witness Thorp contributed to the view that market prices were not truly representative of real values in the depression years.

The "stock and bond" method of valuation has been used from time to time, but it has not generally met with approval. See Bonbright, supra; cf. Chicago & Northwestern Ry. Co. v. Eveland, 8 Cir., 13 F.2d 442, 448. The defendant urges that it be wholly disregarded while the plaintiff suggests that it should be considered by the Court as a check on the value found by capitalizing earnings. I shall not wholly disregard the method but rather I shall consider it along with the other evidence in the case as a component of the entire structure, keeping in mind that it reflected values greatly out of line with true worth as a comparison even with the report of Hartt shows. In passing I may say that I fear the solvency of many great and substantial utilities and industrial empires would have been in doubt in 1932 and 1934 were it to depend upon a security market valuation alone.

A second factor offered in confirmation of Hartt's demonstration of insolvency is found in the testimony of plaintiff's witness, Wedel, an accountant formerly employed by the plaintiff, who prepared an exhibit the purpose of which was explained by plaintiff's counsel as follows: "The purpose of this is to show that whatever experts may testify as to the spot condition, let's call it, in 1932 or 1934, Associated Gas and Electric Company is now insolvent. That will be developed by another witness. And that from 1932 to 1939, which was ten days before it went into Chapter X bankruptcy, its accumulated consolidated deficit after proper charges was some 32 million dollars. From those facts we will argue to your Honor as a matter of common sense that a company which lost money steadily for eight years, then went into Chapter X bankruptcy and now is insolvent by a very wide

margin, could not have been solvent in 1932 and 1934."

The exhibit prepared by Wedel purports to show that Ageco's income for the period from 1932 to 1939 was overstated by $36,936,432.82. The items making up this sum consisted of amortization of debt discount and expense for Ageco and subsidiaries, expenses of the Recap Plan, expenses of opposing the Wheeler-Rayburn Bill, later enacted as Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., legal cases, various investigations, and interest on obligations convertible into stock.

According to the consolidated income statements in the published annual reports of Ageco from 1932 to 1939, inclusive, the company had accumulated earnings of $4,067,396.22.

Wedel's efforts therefore, represented a revision of the consolidated income account for those years. And the basis of such revision rests in his assumption that the items involved properly are chargeable to income and not to capital surplus and corporate surplus as had been the Ageco practice. He differed in his treatment of these items with Stix, who was Hopson's accountant, Haskins & Sells, who certified the figures in Ageco's annual reports, and others. He seems to be supported by the views of the Securities and Exchange Commission which condemned Ageco's practice of charging off debt discount and expense to capital surplus.

Aside from the fact of whether Wedel's figures are proper and assuming that Ageco was at least $32,869,036.60 worse off in 1939 than it was in 1932, to what extent does the testimony confirm Hartt's demonstration of insolvency? I think it adds no more than suspicion to Hartt's actualities. It is true that a company which continuously fails to earn its interest is headed for bankruptcy. But is it valid to backtrack from the date bankruptcy is apparent to speculate upon its origin, where the span of years is five to seven? I think not. In fact I do not think Wedel's testimony confirms Hartt, nor was it primarily offered as such. Its purpose

was stated by counsel, whom I quoted, and its effect will be disposed of in due course.

A third independent set of circumstances offered in confirmation of Hartt's demonstration of insolvency was developed from the testimony of plaintiff's witnesses, Thorp and Jackson.

Thorp, a trustee of Agecorp since 1940, valued Ageco's assets as of the year 1944 and as of the last year end prior to reorganization.

Thorp assigned a value of not more than $125,000,000 for the combined assets of Ageco and Agecorp as of June, 1945. At the end of the year 1939, based on consolidated income, he judged that the assets were worth approximately $73,000,000.

Proof was offered by plaintiff that between 1934 and 1939 the reported consolidated gross income before Ageco and Agecorp interest charges varied only from a low of $9,500,000 to a high $11,800,000 as contrasted with an income of $23,700,000 in 1931. Since, it is argued, Ageco's indirectly held assets are now substantially the same as they were at August 31, 1934, its value must have approximated or been less than the $75,000,000 found in 1939. Even after five years of retention of earnings and other rehabilitations and a marked improvement in market conditions, the value reached only $125,000,000.

Plaintiff's Exhibit 363 was prepared by Jackson as a statement of Agecorp's consolidated net income for the year 1944 before and after his consolidating eliminations. It is based in part on accounting statements contained in the NY PA NJ Utilities Company (Nypanj) annual report for 1944. The defendant points out that Exhibit 363 gives no credit to income for taxes which had been charged as expenses but which Nypanj was not required to pay. In other words, it urges that Thorp should have added to the income which he capitalized the temporary savings in the consolidated Federal Income Tax due to the deduction of interest on Ageco and Agecorp debentures which was accruing but unpaid during the reorganization. The savings of the entire Associated System amounted to

approximately $5,900,000. However, at the time the Agecorp trustees' report for 1944 was prepared, the right of a company in re-organization to treat as a deduction from income for tax purposes interest currently accruing was challenged by the Treasury Department. After the end of the year 1944 an agreement was made with the Treasury Department to the effect that the accruing but unpaid interest constituted a deductible expense until the consummation of the Plan of Reorganization. Thereafter, the tax of the surviving company might be expected to be approximately $5,000,000 higher than the tax payable by the trustees.

Jackson treated the $5,902,466.44 as a credit or addition to surplus and not as a deduction from income and he was in accord with two nationally known accounting firms on this point although a third nationally known accounting firm treated it as an addition to income but labelled it as "non-recurring."

Whether it should be added to income or surplus, its real significance is in the fact that it is non-recurring. Obviously, income which is not expected to continue in the future cannot be capitalized at any substantial "times earnings." The Stone & Webster Service Corporation appears to have given the same treatment to such matters.

In valuing Ageco's assets for 1944, Thorp placed separate values on the Nypanj group, excluding Pennsylvania Edison Company, on General Gas and Electric Company (Gengas), and on Associated Electric Company (Aelec), including Pennsylvania Edison and miscellaneous investments. The Nypanj group contributed $91,000,000 to the total of $125,000,000 and was valued in two ways—by capitalizing gross income at a 6% capitalization rate and from the capitalized value so found, deducting the face amount of securities senior to the common stock; and by capitalizing the net income available for these common stocks at a 10% rate.

Thorp valued the Gengas assets by giving face value for cash and an account receivable and par value for the preferred stock of South Carolina Electric & Gas Company, a value for the latter's common stock equal to earnings capitalized at 8½% although negotiations were then pending for a sale of that common stock at $3,600,000 in excess of that figure. Thorp did not think that figure would be obtained, however. He assigned a value of $55,000 for the common stock of Tidewater Power Company and a range of values of from ten to twelve times earnings for the common stock of Florida Power Corporation. Thorp then reduced the aggregate value of Gengas in the neighborhood of 50%. This reduction was influenced by litigation between the Agecorp estate and the public security holders of Gengas, the compromise of which was pending approval at the time, and which subsequently was given, resulting in the value occurring to the Agecorp estate approximating Thorp's value.

He valued Associated Electric Company's common stock, including Pennsylvania Edison Company, at from $5,000,000 to $10,-000,000 even though prior to the Japanese invasion, Manila Electric Company, a subsidiary of Associated Electric, alone earned from $1,500,000 to $2,000,000 a year and had been valued at approximately $20,000,-000. Thorp said that the Manila plant had been greatly damaged by the Japanese, and that he would add about $10,000,000 to its value if it had continued income. He valued miscellaneous assets of Associated at $600,000.

Thorp valued the Nypanj companies on the basis of 16⅔ times gross income and 10 times net income. The defendant pointed out certain operating companies which were recently sold on a better times earnings basis than that, but Thorp felt that such companies had a capital structure which was more favorable to the interest of the common stockholder or were paying excess profits taxes by reason of increased earnings which factor was thought beneficial pending possible repeal of such taxes.

In valuing Ageco's assets for the last full year prior to reorganization, Thorp's attention was directed to figures in plaintiff's Exhibit 366 for identification, which was not received in evidence since the offering was deferred until the conclusion of cross-

examination. It was later offered by letter of counsel who inadvertently neglected to offer it after cross-examination. It shall be deemed in evidence.

Thorp testified that the figures in that exhibit for the year 1939 were comparable to the net income figures for the year 1944 and on the basis of the former figures he placed a value on Ageco's assets for the last year end prior to reorganization of seven times net earnings arriving at a value of $73,000,000.

Defendant suggests that Thorp's testimony on this point should be weighed in the light of the many changes in the Ageco system, changes in assets, refunding of debt and preferred stocks, and otherwise between January 1, 1940 and the date of trial. The plaintiff asserts that the System contained substantially the same properties from January 1, 1935 through June 15, 1945.

In fact, there were many changes in the System between those dates. Whether they affect Thorp's testimony, assuming it is related, will be decided after the Stone & Webster appraisal has been considered.

Defendant employed Stone & Webster Service Corporation (hereafter designated as the "Service Corporation") to find the fair value of Ageco's assets as of March 31, 1932 and August 31, 1934. The Service Corporation's experience in the utility field is long and varied. Clifford, who is president of the Service Corporation, has devoted more than forty years to the utility field. He organized and directed the work of determining the fair value of Ageco's assets, through Wentworth, a senior vice-president, and Rempe, another vice-president. Clifford participated in all policy decisions and wrote a large part of the first twenty-seven pages of the Service Corporation's appraisal. Wentworth, a graduate electrical engineer of extended experience in the utility field, and who had a part in seventy-five to eighty completed purchases and sales of utilities, also participated in the policy decisions and was consulted by Rempe from time to time as the work progressed. Rempe, a graduate electrical engineer with extensive experience in utility operations had direct responsibility for the valuations. He participated in the discussions with respect to the methods to be applied, selected the staff of employees to work on the valuations, supervised their activities and from time to time discussed developments with Clifford, Wentworth and other executives as the work progressed. The staff was composed of men experienced in the utility field.

Rempe gave the main testimony for defendant on the question of valuation of Ageco's assets. He testified at length and in great detail and through him the voluminous and extensive report of the Service Corporation was put in evidence.

The Service Corporation defines "fair value" as " * * * the price at which an informed, willing seller, under no pressure to sell, would sell and an informed willing buyer, under no pressure for an immediate return, would buy."

The Service Corporation's first step in determining the fair value of Ageco's assets as of March 31, 1932 and August 31, 1934 was to find the normal earnings capability of the Ageco operating companies which is defined as "the foreseeable earning power that a utility property can be expected to develop within the reasonable future. It disregards the effect of abnormal and non-recurring influences on revenues and expenses."

The second step was to capitalize that normal earnings capability at the proper capitalization rates, i. e. the capitalization rates that would prevail in normal markets. The normal earnings capability and the proper capitalization rates represented the judgment of many persons of the Service Corporation. In order to form these judgments, the Service Corporation reviewed the history of the utility industry up to 1934 by a study of available statistics. The review disclosed a uniform and uninterrupted growth of the electric industry from 1912 to 1930, total revenues showing an increase of approximately 10% per year, while the trend of general business was interrupted at intervals by depressions of varying degrees with the result that its long term growth

was only 2½% per year. The condition of the capital markets in 1932 and 1934 was an important factor in the judgment of the Service Corporation because of the need for ample capital in order to effectuate sales of utilities. The availability of new capital was practically nil in 1932 and 1934 so that there was little opportunity to sell utility properties at fair prices, a condition which, it is asserted, was far from normal.

Like Hartt, the Service Corporation prepared a list of "yardstick" companies in order to assist in its judgment. These companies were "well-known companies having published statements and publicly held securities which may be used as standards of comparison in the utility field."

The Service Corporation knew the history of the "yardstick" companies selected and in order to present the basis of comparison between the "yardstick" companies and Ageco operating companies, a quality rating chart was prepared which listed the twelve principal factors considered in rating the quality of the "yardstick" companies and of the Ageco operating companies. These factors included the type of utility, size, customer density, type of territory, growth in operating revenue, financial history and market rating, competition, probable rate base and percent of return, regulations, capitalization, operating ratio before taxes and depreciation and adequacy of earnings. Each of these factors was rated and the total added for the company rating. The Service Corporation prepared these quality ratings for each of the "yardstick" companies and for each of the Ageco operating companies.

After having rated the quality of each of the "yardstick" companies, which rating applied to both dates, March 31, 1932 and August 31, 1934, the Service Corporation determined their "spot" capitalization ratios as of March 31, 1932 and August 31, 1934. These ratios were determined by taking the senior securities of the "yardstick" companies at par and their common stocks at the market prices as of the two dates. The quality rating and the capitalization ratios for each of the "yardstick" companies as of

the two dates were plotted on graphs, and the graphs disclose a definite relationship between quality ratings and capitalization ratios in that the capitalization ratios decreased as quality rating increased. In other words, the market applied a higher times-earnings multiplier to gross income as quality increased. The twenty-seven points on the graphs were correlated and a median line showing the nature and degree of the correlation was drawn for the two dates. It was found that some of the "yardstick" companies fell more than 10% above while others fell more than 10% below the median line, but these companies were considered as subject to special factors such as restricted markets, tax-free securities, stock dividends and disturbing changes in the status of the individual company, which factors were generally recognized by investors.

After determining the correlation lines for the "yardstick" companies for the two dates, the Service Corporation had a basis for assigning the capitalization ratios for the Ageco operating companies in the depressed markets, but it sought correlation lines in normal markets. In search of this it selected five of the "yardstick" companies with a long term history and uninfluenced by special circumstances and trended the annual high-low average capitalization ratios for a composite of those companies, taking their senior securities at par and their common stocks at market price for the period commencing in 1913 and ending in 1933. The public utility bond yields were trended for the same period of time. On the basis of this data, and in the exercise of its judgment, the Service Corporation drew a trend curve through the curve plotted from the composite five company annual high-low average capitalization ratios. The trend curve represents the Service Corporation's judgment of long term capitalization ratios and covered the period from 1913 to 1933 because an informative curve could not be drawn on the basis of data confined to a three year period. In general, the Service Corporation gave more weight to the immediate past than to the distant past. The long term trend curve indicates

that companies of the quality of the five composite companies would sell in the near future, viewing the trend from the two dates in question, at a capitalization ratio at about 5½%. The trend curve reflects general levels only and the long term movement of these levels and the daily "spot" market price would fluctuate greatly up and down around the trend curve.

The Service Corporation's judgment, based on the method used by them and described above, was that a 5½% capitalization ratio was proper in normal markets for a company having a quality of the composite five companies on the basis of the long-term trend.

In order to obtain the capitalization ratios of the Ageco operating companies in normal markets, their quality ratings having first been determined, the Service Corporation drew lines with the same slope as the correlation lines for the "yardstick" companies as of March 31, 1932 and August 31, 1934 through the point, 5½%, determined for the composite five companies. The normal market capitalization ratios can then be read from the graph by referring to the company's quality rating.

Next, the prospective earnings of the Ageco operating companies in post-depression or normal years were sought. A study was made of the trend of the utility industry. A forecast of prospective earnings took into consideration the background of the utility industry, the past history of operations, the history of utilities during depressed years, the future outlook of the Ageco operating properties and possible rate cuts. The prospective earnings in a period of normal operations was a matter of judgment. Deductions were made for operating expenses, taxes, depreciation and the comparative ratios of the "yardstick" companies were used as a guide. The resulting figure was the normal period gross income figure that was capitalized at normal period capitalization rates. Penalty factors were applied where earnings appeared in excess of what regulatory bodies might permit the Ageco operating companies to retain.

The Service Corporation then determined the "spot" value of the operating companies as of March 31, 1932 and August 31, 1934 for the sole purpose of determining the present worth discount which was then deducted from the projected value to arrive at the fair value. The projected value less the discount was the Service Corporation's fair value as of the two dates before adjustments. The fair value was then checked by the capitalization of net income. The net current position of the Ageco operating companies was adjusted so as to conform proportionately to the net current position of the "yardstick" companies and an adjustment was also made for investments. After these adjustments had been made, the balance was the Service Corporation's fair value. Approximately 90% of the fair value of Ageco's assets was determined in this way. Other related capitalization methods based on the Service Corporation's judgment were used to determine 7% to 8% of the additional value while the remaining value was determined on customer, junk or a salvage basis.

The Service Corporation found a fair value for Ageco's assets as of March 31, 1932 of $379,320,000 and as of August 31, 1934 of $247,524,000.

The details of the value found are as follows:

| | March 31, 1932 | | August 31, 1934 | |
|---|---|---|---|---|
| | Par Values or Shares | Valuation | Par Values or Shares | Valuation |
| Post Depression Gross Income | | $ 0 | | $ 0 |
| Capitalization Rate % | | — | | — |
| Capitalized Value | | 0 | | 0 |
| Net Current Position per Books | | (2,125,000) | | (1,622,000) |
| Reserve for Federal Income Taxes per Books | | (3,516,000) | | (3,502,000) |
| Total | | $ (5,641,000) | | $ (5,124,000) |
| **Investments in Affiliated Cos.:** | | | | |
| Associated Gas and Electric Corporation 4 | | | | |
| Open Account Receivable, etc. | | | $ 18,930 | $ 19,000 |
| Convertible Obligations | $300,000,000 | $300,000,000 | | |
| Common Stock | 3,710,000 shs | | 6,710,000 shs. | 227,126,000 |
| Subscriptions to Common Stock | 4,634,344 | 76,220,000 | | |
| Eastern Utilities | | | | |
| Securities Corporation 5–1 | | | | |
| Open Account Receivable, etc. | | | 7,227,287 | 7,227,000 |
| Convertible Obligations 6% | | | 42,330,000 | 18,276,000 |
| Convertible Obligations 5% | | | 9,500,000 | 0 |
| Interest on Open Account | | | 81,886 | 0 |
| Interest on Convertible Obligations | | | 5,226,809 | 0 |
| Common Stock | | | 6,000 shs. | 0 |
| Associated Electric Company 6–1 | | | | |
| Bonds—4½s—1953 | $4,435,000 | $ 4,435,000 | | |
| 4½s—1956 | 1,980,400 | 1,980,000 | | |
| 5s —1961 | 143,000 | 143,000 | | |
| Erie Lighting Company 6–311 | | | | |
| Bonds—5s—1967 | 1,061,000 | 1,061,000 | | |
| Northern Pennsylvania Power Company 13–9 | | | | |
| Bonds—5s—1956 | 1,040,300 | 1,040,000 | | |
| Total | | $384,879,000 | | $252,648,000 |
| **Other Assets:** | | | | |
| Office Equipment | 164,742 | 82,000 | | 0 |
| Total Valuation | | $379,320,000 | | $247,524,000 |

The plaintiff attacks the appraisal of the Service Corporation in various respects.

Initially he decries the standard of value used by the Service Corporation. I have indicated heretofore what I believe to be the proper standard and I feel that the Service Corporation as well as Hartt followed it. The difference lies in the methods of applying the standard. The plaintiff insists that the Service Corporation's fair value is "based on what they estimated a willing buyer would pay to a willing seller at the end of the depression (which they estimated would come within two years of March 31, 1932 and within three years of August 31, 1934) less a present worth discount to compensate for the fact that such a price was not presently obtainable." The defendant equally insists that the Service Corporation fairly valued the assets solely as of the two dates in question. I believe that it did, and the Service Corporation's report, if subjected to criticism, is not so because of an improper standard.

Secondly, the plaintiff contends that the Service Corporation's valuation even judged by its own standards, is unsound. This is an omnibus criticism, and the details will now be considered.

The plaintiff prepared an exhibit comparing the actual (adjusted according to the Service Corporation's formulae) and the Service Corporation's predicted gross income, exclusive of inter-company other income, for the 19 largest companies in the Associated System. It showed that for the twelve months ended March 31, 1934 the prediction exceeded the actual by $10,576,000 or 41.20%. For the twelve months ended August 31, 1937, the prediction exceeded the actual by $6,376,000 or 23.85%. These facts are advanced to show the unreasonableness of the Service Corporation's predictions. Admittedly, this exhibit depends upon hindsight as does plaintiff's Exhibit 434 in which the gross revenue and gross income for the 19 companies was trended from 1928 to 1938. The trend shows the Service Corporation's projections to be far from the actualities. In March, 1932 income and

revenue were decreasing, and it would have have necessitated an astounding turn of events to reach the Service Corporation's post-depression prediction of March 31, 1934. In August 31, 1934, income was still decreasing while revenue was increasing. The Service Corporation's post-depression prediction for August 31, 1937 was well above the actuality for income while its prediction of revenue was fairly accurate. This latter phenomenon, the plaintiff suggests, developed from the Service Corporation's failure to take account of increasing ordinary expenses and taxes, plus decreasing rates which involved greater expenses in producing and selling additional kilowatt hours for the same revenue.

All of the plaintiff's argument on this point depends upon facts which would not have been available to the Service Corporation at the appraisal dates. The theory of the argument is not that the Service Corporation's predictions were unreasonable in the light of the facts as they existed in 1932 and 1934, but rather that they were unreasonable in view of the subsequent history of events. This concededly is a hindsight judgment, which is ordinarily an improper criterion for the measurement of conduct. But the plaintiff urges its propriety here because of the Service Corporation's use of prophecy in establishing value. This is a refinement of the general proposition but I prefer to leave it open until the whole subject of hindsight evidence, of which there are many examples in this case, may be examined.

The plaintiff asserts that the Service Corporation wrongfully assumed that State Commissions would indefinitely permit earnings up to 10% on the probable rate base and earnings over 10% for a period of over ten years.

Rempe testified that the Service Corporation considered anything up to 10% as good sound earnings and earnings which should be capitalized at the best rate and that it penalized earnings beyond 10% in 1932 and 9% in 1934 because it appeared that regulation was becoming more severe. He said that permissible rates of 8% were not a thing of the past and that New York

companies were earning substantially more than 8% after 1931 and 1932 on the probable rate base that the Service Corporation had assigned to such companies. He knew of no general decline in rates of return for electric and electric and gas combination utilities from 8% to between 6% and 7% from 1927 to 1934. He said that utility companies in Pennsylvania were earning and continued to earn more than 10% all through the period from 1931 to August, 1934. Rempe admitted that the Service Corporation, in preparing its report, did not examine any rate decisions in any jurisdiction in which any Associated subsidiary operated. He realized, however, that regulation was increasingly severe from 1932 to 1934, particularly in New York which accounted for one-third of the basic value of System companies.

On February 25, 1931, in the case of Utica Gas & Electric Corp., P.U.R., 1931 D, 289, the Public Service Commission fixed 7% as an allowable rate of return and pointed out that 8% rates of return should no longer be contemplated.

On April 24, 1934, the New York temporary rate law became effective giving the Public Service Commission power to fix temporary rates as low as 5% on a rate base limited to original cost less accrued depreciation.[9]

On August 1, 1934, the Public Service Commission of New York in a contested proceeding against Long Island Water Company,[10] an Associated subsidiary, fixed a 6% rate of return on a rate base of $3,275,000. Such a return amounts to $196,500. Mr. Rempe never heard of this case, nor any other case mentioned by counsel during his cross-examination. He said, however, that it would not change his conclusion that the probable rate base

of that Company was $5,000,000, or that New York Associated Companies would be permitted to retain indefinitely earnings up to 10% It is significant that the Service Corporation's estimate of reasonably foreseeable gross income as of August 31, 1934 was $224,000.

There were numerous other rate proceedings unknown to Mr. Rempe and unexamined by the Service Corporation.[11]

Pennsylvania, the second most important State in the Associated System, was considered by the Service Corporation as representing the strictest degree of regulation. Nevertheless, the rule of 8% normal earnings and 10% indefinitely returnable earnings was applied to Pennsylvania companies also. This despite the announcement of the Pennsylvania Public Utilities Commission on April 2, 1934 fixing the rates during the depression on a basis of 6%.[12]

I believe that the Service Corporation omitted an important factor in failing to give consideration to rate proceedings. Although Mr. Rempe denied that there was a general decline in allowable rates of return from 1927 to 1934, I feel that the facts indicate such decline, especially in the depression period. It may be true that a rate of return may not be fixed applicable to all utilities, all companies, all localities for all periods of time and that a fair rate of return depends upon the facts and circumstances surrounding the company at the time the rate is determined. It may also be true that New York companies were earning more than 8% after 1931 and 1932 on the probable rate base that the Service Corporation assigned to such companies. But I fear that it was unrealistic to anticipate rates of 9% and 10% to continue and to

9. Public Service Law, McK.Consol.Laws, c. 48, Art. 6, § 114. The law was held constitutional in Bronx Gas & Electric Co. v. Maltbie, 1936, 271 N.Y. 364, 3 N.E.2d 512.

10. Plaintiff's Exhibit 448 for identification upon which ruling was reserved. It is allowed in evidence.

11. See, for example, Driscoll v. Edison Light & Power Co., 307 U.S. 104, 59 S.Ct. 715, 83 L.Ed. 1134; Los Angeles Gas & Electric Corp. v. Railroad Commission of California, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180; Dayton Power & Light Co. v. Public Utilities Commission of Ohio, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267.

12. Re Utility Rates During Economic Emergency, 3 P.U.R.,N.S., 123.

project income on such bases when evident signs pointed to returns of substantially less than such rates and less even than 8% in those days.

The plaintiff has submitted figures showing the aggregate excess of predicted gross income, exclusive of inter-company other income, over returns ranging from 7% to 10% on the probable rate base for the post-depression years March 31, 1932 and August 31, 1934. For the former it amounted to $5,453,000 which capitalized at 6% amounts to $90,883,000. For August 31, 1934 the comparable excess was $3,815,000 which capitalized at 6% equals to $63,583,000. Of course, these figures are of a speculative nature, but I do believe that they are significant in that they suggest the extent of the Service Corporation's omissions in regard to rate regulation.

The plaintiff disputes the representative character of the five test companies selected by the Service Corporation in obtaining the post-depression capitalization rates.

Mr. Rempe testified that these companies should be the type not influenced by special factors [13] and which respond well to the rating methods used. They should fall on or near the median line on the correlation charts, and on March 31, 1932, they did. However, it appears from the August 31, 1934 correlation chart that the five test companies at that date (which obviously affects the 1937 gross income capitalization rate more than the 1932 date) were subject to special influences which pulled three of them over the 10% zone on the high side. The weighted average of the "spot" gross income capitalization ratio of these companies at August 31, 1934 was 6.07%, which was approximately .43% lower than it should have been for a company with a rating of 103.4.

Rempe further testified that a selection of five companies below the theoretical position on the median line would give just as fair a valuation as his five test companies, if they had a sufficiently long term history and unless there were special influences that operated against their normal trend. The plaintiff tested this assertion by the use of five companies on the low side of the median line. Hartt plotted their gross income capitalization ratios and drew through the line connecting these points a trend line substantially bisecting the major swings, just as Rempe did. At December 31, 1933, Hartt's trend line indicated a gross income capitalization ratio somewhat less than 1% higher than Rempe's trend line, which the plaintiff asserts, is "presumably" about ½% higher than it should have been, just as Rempe's was ½% lower. The plaintiff points out in confirmation of this supposition that the average gross income capitalization ratios for the 26 [14] "yardstick" companies was, at December 31, 1933, $\frac{7}{10}$% higher than a similar ratio for the five test companies. Plaintiff's Exhibit 436 was offered in evidence in support of this contention and its receipt was delayed pending a check by defendant's counsel. It shall be deemed in evidence.

The plaintiff submits, therefore, that the Service Corporation's future gross income capitalization ratios are high in the neighborhood of ½%, which results in an overstatement of basic value of $54,409,000 in 1932 and $50,894,000 in 1934.

These figures are, to say the least, impressive, but, of course, they represent a very rough approximation of the extent of error in the Service Corporation's future gross income capitalization ratios even on Hartt's demonstration. I am especially impressed, however, by the fact that they suggest an inference that the Service Corporation's post-depression capitalization ratios are unduly influenced by the optimism represented in the use of the three companies on the high side, which were, of course, at August 31, 1934, not typical.

13. A special factor or special influence is anything which affects market value but is not reflected in the rating chart. Special factors are assumed to be operative in the case of any company which is substantially off its theoretical position on the median line of the correlation chart.

14. Philadelphia Electric Company was omitted because information back to 1929 was unavailable.

The plaintiff also criticizes the Service Corporation's technique in assigning quality ratings to the Associated companies. The plaintiff asserts that the bad reputation of the Associated management with the investor, the consumer and the general public and the bad relations of this management with the State Commissions, particularly the Public Service Commission of New York, were factors which the Service Corporation failed to consider but which would adversely affect the amount which a willing buyer would pay for their earnings. The defendant's Mr. Place in his report to Aldrich refers to this "* * * question of the character and ability of the management as the principal, controlling influence which is keeping these securities down far under what statistically, they would appear to be worth." Rempe admitted these factors were not considered in establishing the ratings, and thought they were special factors which would require analysis in each individual company. He conceded that they had some weight with regard to market price but little weight as regards fair value. The plaintiff does not suggest the weight to be given to these factors but I am satisfied that it should be very little. I can understand that such factors could be influential in determining a party's regard for the property but it is impossible to decide the extent thereof.

Another criticism in connection with the ratings is the failure of the Service Corporation to consider the adequacy and physical condition of the plant. Of course, the Service Corporation could not have inspected the properties as they were in 1932 and 1934, but it could have, according to the plaintiff, drawn on the knowledge of William G. Gilman, an engineer who inspected them in 1932 and of personnel of the Stone & Webster Engineering Corporation, who inspected them in 1935. Gilman's reports, offered by plaintiff, were excluded on the ground that if the Service Corporation should have considered the condition of the plant and did not, it was unnecessary to show what that condition was, and that the reports were not proper rebuttal.

I believe my ruling was correct principally in that they did not rebut defendant's witnesses. Gilman was not testifying as an expert and his reports were offered as fact and not opinion.

Rempe said an inspection of properties is helpful in valuing them but that the inspection is used only to confirm what company figures show. He stated that plant conditions may usually be known from the figures of the company. For example, maintenance figures indicate the care given to the upkeep of the plant, and inferences may be drawn as to its condition. Whenever an inspection does not confirm what the books purportedly show, then a reconsideration of the problem is necessary. Naturally, there could be no inspection by the Service Corporation here, but a confirmation of the books might have been attempted by a resort to Gilman's reports or to the Engineering Corporation's reports.

Admittedly this was not done, assuming, of course, that the Service Corporation was aware of the Gilman reports. The Service Corporation took such plant conditions into consideration and the fact that such a factor was not part of its rating chart is not significant, nor does the fact that the Gilman reports are replete with adjectives respecting conditions such as "fair", "poor", "obsolete", and the like indicate that the Service Corporation's regard for plant conditions was any different. The same view may be taken of the Stone & Webster Engineering Corporation's report on this point.

I am satisfied that the reports were properly excluded and that they would have been of little weight had they been admitted.

Another error in the ratings, the plaintiff argues, was the use of the 1931 ratings of the Associated companies in the 1934 appraisal. Rempe testified that he had made a check by re-rating certain of his yardstick companies for 1934 and that he later re-rated all of them, but found it more conservative to use the 1931 ratings. The plaintiff appears to have no response to this, nor does he offer anything substantial to show that the use of the same

ratings each time represented error. One example of a company which passed preferred dividends in the interim is not persuasive.

The plaintiff calls attention to the security market quotations of some of the Associated equities around the crucial dates and post-depression dates. Undoubtedly, the public showed less regard than the Service Corporation for these items. However, this matter has been gone into previously in connection with the security market appraisal of Ageco's assets in confirmation of Hartt's values. I shall not add more.

The plaintiff's next criticism relates to the Service Corporation's method of calculating the present worth of the capitalized income.

As explained before, the Service Corporation predicted a post-depression gross income, exclusive of inter-company other income and a post-depression gross income capitalization ratio, and then multiplied the two together and obtained a post-depression or future valuation. From this post-depression valuation they deducted the spot value obtained by multiplying the spot earnings by the spot capitalization rates. The difference represents the expected appreciation. Having obtained the appreciation, the current worth of the capitalized income was calculated "by applying to one-half the appreciation the standard discount formula for two years (from March 31, 1932; three years, of course, from August 31, 1934) at a rate equal to the particular company's capitalization rate." The post-depression value less the discount was the Service Corporation's fair value before adjustments.

The plaintiff questions the wisdom of discounting only one-half the appreciation, of not discounting the entire post-depression valuation and not merely the appreciation, and of using a discount rate equal to the company's post-depression capitalization rate.

Rempe testified that the one-half factor represented the Service Corporation's judgment of what would be a meeting of minds between a willing seller and willing buyer who would take into consideration the post-depression increased earnings capability of a company. In other words, it is based on the assumption that the owner of the property would get an increase of income on the investment from the date in question until the period of normalcy had been attained.

It is obvious that it would be improper to discount the entire post-depression valuation for there the seller would be acquiescing in discounting a sum which includes the so-called "spot" value; and the "spot" value represents a sum theoretically obtainable at that time without any discount concession by the seller.

Whether or not the Service Corporation's one-half factor is reasonable, it is certainly more reasonable than the plaintiff's suggested discount of the entire appreciation. If the post-depression value of a company is to be greater, it necessarily depends upon increased income in the process of reaching such value. And if the entire appreciation were discounted the buyer would be obtaining the sole benefit of this increased income. It would seem wiser, therefore, for the seller and buyer to compromise on this point so that each might benefit from the increase.

I do not intend to suggest that the Service Corporation's method has my entire approval, but I feel that it is more reasonable than plaintiff's suggestions. I speculate, however, whether it would not be more consistent with the Service Corporation's method to divide the difference in the post-depression gross income and the "spot" earnings between the parties without discount. That difference would represent the increased income to which Rempe referred.

The Service Corporation used a discount rate which was the same as any particular company's post-depression capitalization rate. Rempe testified that this was proper in its judgment. He further testified that no differentiation was made between pure interest discount and risk factor. For example, no element of risk was represented in the 5½% discount rate for Staten Island Edison. Actually, I fail to see what significant effect an element of risk would

have if the discount rate is the same. 4½% plus 1% of risk still makes 5½%. Possibly the interest rate should have been higher since the capitalization rates taken represent the post-depression normal rates, but I have no way of knowing whether the discount rate should be any given percentage higher than the capitalization rate even though it seems that the predicted income for Staten Island Edison fell below the actual by 30% for 1932.

Next, the plaintiff argues that the Service Corporation failed to take account of the following liabilities of Ageco subsidiaries:

First, the right to convert the Agecorp 73s into double the principal amount of 78s.

The circular announcing the Recap Plan stated that the holder of an Agecorp '73 Debenture could, at any time after June 15, 1935, exchange it for double the amount of Agecorp income debentures due 1978. Actually, the fact that such an option existed in holders of '73s did not increase Agecorp's liabilities on August 31, 1934. Whatever notion might be had on August 31, 1934 about the right of exchange, a liability of $50,000,000 was decidedly remote since the permissive date for exchange had not arrived nor could the amounts to be exchanged be predicted. I would, therefore, not agree to include $50,000,000 as liability on August 31, 1934, as plaintiff suggests. Hartt evidently did not so agree either.

Second, the General Gas and Electric Corporation (Gengas) controversy; and third, the Utilities Employees Securities Company (Uesco) "welfare" claim.

I fail to see how the Service Corporation could have significantly evaluated the Gengas and Uesco matters in 1932 and 1934. The Gengas controversy arose out of litigation which subsequently had some measure of success for the public security holders; while the claims on behalf of the System employees that the equity in Uesco over and above the claims of the bond and note holders should be devoted to welfare purposes, as was originally resolved in creating the company, were advanced in the reorganization proceeds of Ageco.

Both liabilities depend upon occurrences not apparent in 1932 and 1934.

Another criticism of the Service Corporation's practice involves the principle that senior security holders, unless paid in cash or new senior securities, must in a reorganization, be given something extra to compensate them for the loss of seniority. See Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

I think it sufficient answer to that criticism that Ageco was not in reorganization at the crucial dates; and the plaintiff does not point out how the principle should otherwise apply.

The plaintiff points out other purported errors in the Service Corporation's report.

He calls attention to the fact that for the post-depression year August 31, 1934, the Service Corporation repeatedly projected increased revenue with decreased expenses. Rempe testified that he thought the overall operating expenses would be down because the operating ratios of the companies were higher at the time of the valuation than the industry average; that the Service Corporation analyzed various factors comprising operating expenses, and these expenses for the post-depression year were estimated on the basis of anticipated revenues and sound operating factors.

This, of course, represents the judgment of the Service Corporation, and the plaintiff has done no more to refute it than the mere mention of the point, even in those instances where a particular company would find it necessary to purchase increased power from others. Ordinarily, increased productivity in anything presages increased expense, but undoubtedly improved operating methods may alter the relationship.

The plaintiff contends that the Service Corporation, in adjusting electric depreciation, should have recognized the improvement in industry practice using 10% of operating revenue in 1934, if not 1932 also, when it was looking two years into the future, instead of the 9% for both of the estimated periods.

Rempe testified that the "yardstick" group on an average set aside 9% of

electric revenues as depreciation accrual; that 9% represented in the judgment of the Service Corporation a sound figure from a study of the "yardstick" figures.

According to Moody's Manual, depreciation of the electric utility industry increased steadily from 1932 through 1936 and the percentage of depreciation to electric revenue was 9.05% in 1932 and 10.2% in 1934.

Rempe said the increase was due to increased retirement expense and decreased revenue although it appears that the Service Corporation did not increase retirement expense between March 31, 1932 and August 31, 1934. He did not believe the depreciation figure should have been higher in 1934 than 1932. Projecting from 1934 he did not believe there would be a further increase in the percentage of depreciation by the industry within the next three years. He also was aware that depreciation was going up in the period immediately prior to August 31, 1934.

Electric revenue of the System amounted to approximately $67,500,000 in 1931. 1% of that is $675,000 which capitalized at 6% amounts to $11,200,000. It may be seen, therefore, that the depreciation adjustments have a substantial bearing on the System value.

The weighted average of depreciation to operating revenue taken by the 27 yardstick companies was 8.61% in 1931 and 9.7% in 1933. At least 3 yardstick companies were gas companies, one was solely a water company and others did a gas and water business in addition to an electric business. The depreciation taken for these companies is less than electric depreciation. Rempe admitted that the percentage of electric revenue taken amounted to more than 8.61%, and he thought 9% was a good figure.

I think 9% was reasonable for 1932 and compared favorably with the industry percentage of 9.05%. I am at a loss, however, to find how the Service Corporation may justify 9% for 1934 when everything pointed to a higher percentage. The in-

dustry average rose to 10.2% at that time and the weighted average for the yardstick companies was 9.7%. If the percentage for all revenue (8.61%) was less than the percentage for electric revenue in 1932, it is natural to assume that the percentage for all revenue (9.7%) was less than the percentage for electric revenue in 1934; and it probably more nearly approached the industry average in that period.

I cannot judge whether 10% is the proper figure but I believe it more nearly reflects actuality in 1934.

The plaintiff next points to the purported excessive value placed upon the System service companies by the Service Corporation. These were valued exclusive of their investments and net current assets, at $17,870,000 in 1932 and $15,500,000 in 1934. Their most valuable asset was the expectation of future business from the Associated System. The Service Corporation capitalized their projected gross income on a 10% basis.

I believe the values are excessive. It is interesting to note, that in 1931, the Service Corporation took the attitude that the servicing of affiliates or controlled companies at a profit should be discontinued. Rempe testified that there were men in the industry who were not agreeable to the procedure of holding companies being permitted to derive a profit directly or indirectly from servicing their subsidiaries.

Contemporary clamor cast serious doubt about the future of such service companies, and they eventually ceased to exist in New York State in 1934 [15] and the United States in 1935.[16] It is difficult to accept such valuations for companies which the Service Corporation must have known, or presumably purported to know had a precarious future. On June 14, 1932, the Public Service Commission of New York severely criticized the methods of the Associated service companies and Rempe was aware of such criticism.

What value might be attributed to the service companies in 1932 and 1934 is im-

---

15. Now article 5-A, § 110, subd. 3, Public Service Law of New York.

16. Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq.

possible of ascertainment but undoubtedly it was a lot less than the Service Corporation figures, and more likely closer to Hartt's who capitalized at 20% the existing income of the service companies.

The plaintiff also argues that prior appraisals of the Stone & Webster organization are inconsistent in many respects with the present appraisal.

A preliminary question arises as to the admissibility of two of these reports. One of the appraisals was made by Stone & Webster, Inc. while the other was made by the Stone & Webster Engineering Corporation. The defendant objects to their admission because these two corporations were separate and distinct from the Stone & Webster Service Corporation which made the appraisal here. I reserved decision in the course of the trial upon the offer of the reports in evidence.

Stone & Webster was originally a partnership and was incorporated as Stone & Webster, Inc. in 1929. At the same time it organized three wholly owned subsidiaries to carry on the three principal divisions of of its business. The management division became the Stone & Webster Service Corporation while the engineering division became Stone and Webster and Blodgett. All these corporations had their offices in the same premises and personnel was sometime shifted around to meet the necessities of a particular job being done by any one of the corporations. For example, the report of Stone & Webster, Inc. on the subsidiaries of National Electric Power Corporation was signed by Clifford as Vice-President of Stone & Webster, Inc. Clifford's main position at that time was that of President and operating head of the Stone & Webster Service Corporation. Rempe, his chief assistant, did a great deal of work on the report. The figures as to market appraisal were furnished by Stone and Webster and Blodgett. Rempe opined that the Service Corporation contributed more to the crew that worked on the National Electric Power report than any other branch of Stone & Webster.

It may be inferred, therefore, that the Stone & Webster organization was fairly well integrated and that there was great cooperation among the organizations of which it was composed. In view of these circumstances, may I disregard the separate existences of the three corporations and treat the reports of Stone & Webster, Inc. and of the Stone & Webster Engineering Corporation as efforts of the Service Corporation? In other words, may I hold that there was such unanimity of function among them that their separate existences were in reality legal cloaks for facility of operation? I feel that I may not.

The law with respect to ignoring the corporate fiction is clear in its insistence upon factors indicating such a unity of relationship among formally independent corporate entities that an adherence to the principle of separate existence would work a fraud or other injustice. Rapid Transit Subway Construction Co. v. City of New York, 259 N.Y. 472, 182 N.E. 145; Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599; Stone v. Eacho, 4 Cir., 1942, 127 F.2d 284, certiorari denied 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512. "The logical consistency of a juridical conception will indeed be sacrificed at times, when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. * * * At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form." Berkey v. Third Avenue Ry. Co., supra, 244 N.Y. at page 95, 155 N.E. at page 61.

I can see no reason here, however, for ignoring corporate entities. There is no doubt that the three corporations functioned separately in law and fact. They had their own personnel and they performed their own duties and it does not appear that anyone dominated or was dominated by any one of the others or that there was even influence exerted among them.

For this reason alone the reports of Stone & Webster, Inc. and of the Stone & Webster Engineering Corporation are inadmissible to attack the credibility of the Stone & Webster Service Corporation.

■ A separate reason exists, however, for the admission of the report of Stone & Webster, Inc. on the subsidiaries of National Electric Power Corporation. Clifford of the Service Corporation assumed responsibility for that report and for the present one. Although he did not testify in detail with respect to either report, they both reflect what are presumably his views, since he approved them, and are admissible to impeach his credibility to the extent that they are contradictory.

Rempe did considerable work on the National Electric Power report, as Clifford's chief assistant, but he apparently had no part in forming judgments, so that I feel that the report has no significance as far as he is concerned.

The appraisal of the subsidiaries of National Electric Power was made in 1932 for a group of banks, including the defendant. These banks had already made loans secured by the common stocks of the various subsidiaries of that company and were contemplating further loans. The report arrived at two values: (1) " 'approximate market value', determined by current quotations where available, otherwise by comparison with similar securities having a quoted market", and (2) an " 'estimated market value with return of moderate investment demand'; that is, as soon as securities of the respective types command a ready market." The plaintiff contends that these values are comparable to the Service Corporation's spot value and post-depression value.

Stone & Webster, Inc. in the National Electric Power report, set down revenue and gross income for the twelve months, ended March 31, 1932. This income was then adjusted downward and applied to the bonds, unfunded debt, preferred stock and common stock of a company. There was then set down a "preliminary estimate of equity in tangible property" applicable to each class of security. Finally, the "approximate nominal market value" and the "estimated market value with return of moderate investment demand" for each class of security was shown. These columns are totalled. From these figures, there can be derived gross income capitalization ratios which may be compared with the "spot" and post-depression capitalization ratios which the Service Corporation, as at March 31, 1932, have figured for the Associated companies. These gross income capitalization ratios indicate for 9 National Electric Power subsidaries that on the average the subsidiaries were selling or should sell on the "spot" market at 9.8 times their adjusted "spot" earnings and would sell on the post-depression market at 13.9 times the adjusted "spot" earnings.

By contrast, for example, the Service Corporation's "spot" capitalization rate of Staten Island Edison Company as at March 31, 1932, is 6.50% which is 15.4 times earnings. And the post-depression valuation as at March 31, 1932, is 20 times the adjusted "spot" gross income. Both of these ratios are approximately 50% higher than ratios which in 1932 Stone & Webster, Inc. found to be applicable to the National Electric Power subsidiaries.

Rempe was subjected to cross-examination about the National Electric Power report. He testified that "spot" figures were capitalized; that the banks were primarily interested in what they could get in case of foreclosure; that a different standard of valuation was used in the National Electric Power report since the banks necessarily were interested in knowing what cash they might obtain in the depressed market without waiting for normal markets; that this standard is quite different than that obtaining between a willing seller and willing buyer; that the worst possible conditions are assumed in making a collateral appraisal.

In the National Power report the following is included: "Trend of electric earnings for the United States as a whole shown on the chart entitled 'Comparative Trends of Electric Revenues—Entire United States' submitted herewith shows a decided decline, which to some degree at least may be observed by operating companies, but which creates uncertainties, making it more difficult than in previous years to satisfactorily estimate performance; therefore any attempt under present conditions to estimate

cannot be considered more reliable than forecasts of probable changes which may favorably or adversely affect the country as a whole."

Rempe said he agreed with that statement even though he testified in connection with the present appraisal that he expected the up-turn to begin within three to six months from March 31, 1932.

Clifford was responsible for the statement and also the following which was contained in the National Electric Power report: "Earnings are based on general business activity continuing as at present but are optimistic in the event further decline, shown by May reports, continues throughout the year."

In general, I feel that neither the words of Clifford nor of Rempe were greatly shaken by what was done or said in the National Electric Power report. I think the significance in comparing the two reports and in comparing Rempe's agreement with the statement about the outlook for utility earnings with his views in the present matter lies in the attitudes reflected. The National Electric Power report was pessimistic by reason of the state of the times and of the nature of the project. Clifford and Rempe display an optimism in the Associated report somewhat contrary to the report that was given the banks. I cannot say, however, that the attitudes are entirely unjustified. I perceive the difference in the purposes of the two reports and in the standards used. There are no great contradictions in law nor fact. There are differences about the future outlook of utility conditions. Therefore, I admit the report on the National Electric Power subsidiaries only to the extent that the written statements of Clifford, above quoted, are somewhat inconsistent with the views displayed in the present report of the Service Corporation, which he authorized.

The fact that Rempe thought it significant to show that the domestic rates of subsidiaries of National Electric Power were substantially above the national average and that he made no such study in this case is of little importance.

Stone & Webster Service Corporation made a report in 1944 in connection with a plan for the reclassification of the stocks of Columbia Gas and Electric Corporation under the Public Utility Holding Company Act of 1935. The plaintiff points out that there the Service Corporation recognized the propriety of awarding to security holders an additional 10% of common stock to compensate them for their loss of priority. This matter was raised before and I believe it is sufficient to note that the Columbia Gas proceeding involved dissolution in which the preferred stockholders were receiving common stock as compensation. The same is true in reorganization, as in the Consolidated Rock case, supra. There is no authority for applying such a rule to. the sale of a going concern between a willing seller and willing buyer.

In the Columbia Gas report, the Service Corporation refused to predict future gross income in excess of 7½% of the net book cost, taken as the probable rate base. Rempe testified that the disparity between 10% in 1932 and 7½%, and 9% in 1934 and 7½% is justified by the higher degree of regulation that developed over the years. Whether the disparities are proper or not is uncertain, but it is reasonable that reduction was indicated by the conditions of the times.

At this point I think it wise to discuss a problem which has been referred to in many instances throughout the opinion. It concerns so-called "hindsight" evidence, i. e. evidence of subsequent events as bearing upon the propriety of a previous judgment or the existence of a prior condition. The plaintiff has made liberal use of such evidence over the objection of the defendant. It has many facets, but I believe a general discussion is first in order.

Ordinarily, hindsight evidence is inadmissible to prove or disprove the existence of a previous condition. "A wisdom developed after an event, and having it and its consequences as a source, is a standard no man should be judged by." Costello v. Costello, 209 N.Y. 252, 262, 103 N.E. 148, 152; In re Cleveland Discount Co., D.C. Ohio 1924, 9 F.2d 97; Guggenheim v. Helvering, 2 Cir., 1941, 117 F.2d 469; Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647; cf. Irving

Trust Co. v. Jacob Weckstein & Son, Inc., 2 Cir., 1933, 64 F.2d 333; Doric Apartment Co. v. Commissioner of Internal Revenue, 6 Cir., 1938, 94 F.2d 895.

Frequently, however, a resort to such evidence is rendered necessary by the nature of the fact to be proven in that a confinement to contemporary events would result in grave injustice. For example, in Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449, the Court permitted evidence of the subsequent use of a patent to show the value of the patent at the time of the breach of a contract to assign the same. See also Matter of Board of Water Supply in City of New York, App.Div. 3rd Dept. 1924, 209 App.Div. 231, 205 N.Y.S. 237.

The plaintiff concedes the general rule but argues that such evidence should be admitted against the defendant as a wrongdoer to appraise the consequences of its wrongful act. I cannot see any merit in this argument. It might be true were we attempting here to follow an asset unlawfully diverted, shall we say, in order to restore to the original owner all the benefits and profits he would have received had the asset not been diverted by a wrongdoer and to take from the wrongdoer any advantage he may have obtained by his wrongful act. But aside from those observations, it is illogical to apply a purported rule for wrongdoers in order to prove the wrong. If it was certain that the defendant was a wrongdoer it would be unnecessary to use this evidence; and it may not therefore be used to establish a condition when such condition is a prerequisite to its invocation.

■ The plaintiff further argues that when one has recourse to prophecy to establish value, it may be shown by subsequent events that the prophecy was unreasonable when made. I believe that this is true if the subsequent events could reasonably be anticipated at the time of the appraisal. But then this would not be strict hindsight but rather would be an attack on the bases of the prophecy at the time it was made. It is not true if it means that subsequent events are admissible just to show how wrong the prophecy was.

The reasonableness of the prophecy is a big part of the defendant's case and it will be appraised upon the basis of what the Service Corporation knew at the time it made it.

I am now convinced that the hindsight evidence put in by plaintiff is not proper and competent evidence and it shall not be taken into consideration by me in this decision.

At the end of plaintiff's case, defendant moved to strike from the record certain exhibits received in evidence and certain testimony in connection with the said exhibits. At the time I reserved decision but at the next hearing day I denied defendant's motion to strike in toto. This motion to strike included exhibits and testimony in connection therewith that had to do with this hindsight testimony. I realize and so stated at the time that I was very liberal in the reception of such evidence. There was no jury present. I thought it better to get the whole picture and that I could evaluate it when it came time to read the testimony and the briefs and to decide the issues. I have now done so.

This ruling does not include the hindsight value added to the appraisal by Hartt. The defendant objected to the entire method of arriving at such added value but since the additional value benefits the defendant's case, pro tanto, I will, therefore, let the evidence stand as a hindsight value and take into consideration the defendant's overall criticism of the method.

■ It is necessary now to evaluate the proof on each side in connection with the prime issue of insolvency. I believe that the plaintiff established a prima facie case on this point. Although Hartt was not as thorough as he might have been with more time and money to spend, I feel that he did a competent job. He did make some mistakes and omissions but I believe they were substantially corrected. The principal weakness in his report concerns his dependence, pursuant to counsel's instruction, upon conditions prevailing on the valuation dates. Ordinarily he would not have so confined himself. He treated the earnings of the Ageco operating companies for the twelve months ending March

31, 1932 and August 31, 1934 as reasonably prospective gross income figures. But his failure to project is excused, in my view, by the fact that trends of earnings were generally downward at the valuation dates.

On the other hand, I feel that defendant has not convincingly negated the plaintiff's case. The appraisals of the Stone & Webster Corporation are, in my opinion, the ultimate insynthesis. Its "spot" values, too, found Ageco to be insolvent. But because utility conditions were abnormal at that time it found it necessary to construct an elaborate formula in order to reflect what it considered fair value at the valuation dates. The formula necessitated the indulgence in prediction of the return of normal markets and normal capitalization rates in those markets. By hindsight the predictions are far from the mark. But hindsight may not be used to test these predictions, as I have indicated before, so that the Service Corporation's judgment must be tested by what was before it at the appraisal dates. Nevertheless, I feel that it must be noted what an unrealistic method was pursued by the Service Corporation in that with a full view of conditions that prevailed after the appraisal dates it could recall eleven and thirteen years later its feelings about future business conditions around the appraisal dates. I need not bother about what actually happened subsequently, however, for I have little faith in the Service Corporation's predictions. Conditions in 1932 and 1934 and future trends did not warrant the optimism displayed by the Service Corporation. Clifford was not so optimistic in the National Electric Power report. In general I believe that the predictions were not an accurate representation of what the Service Corporation should have felt.

Further, I feel that the Service Corporation's values were excessive to the extent that it projected earnings up to 10% on the probable rate base and earnings over 10% for a considerable period despite the fact that indications everywhere suggested lower rates.

Further, I believe that the Service Corporation's value is excessive in 1934 by reason of the fact that its gross income capitalization rates are too high in 1934 based upon its own five test companies.

Further, I believe that the Service Corporation was unreasonable in using 9% in 1934 in adjusting electric depreciation when evident signs justified a higher rate.

Further, I believe that the Service Corporation's values for the Ageco service companies were excessive in 1932 and 1934 when it was plain that their future was dim, a fact of which the Service Corporation should have been well aware in those days.

The Service Corporation values of $379,320,000 at March 31, 1932 and $247,524,000 at August 31, 1934 are, to my mind, a decided overstatement for the Ageco properties. Aside from the fact that I believe its optimistic predictions of normalcy and high capitalization rates were unwarranted, I am of the opinion that it has overstated value to the extent of from $50,000,000—$90,000,000 in 1932 and from $30,000,000—$60,000,000 in 1934 on account of projecting earnings up to 10% on the probable rate base at those times. These figures might be somewhat higher or lower, but it is fairly certain that they are close to or within the range I have stated. Also I believe that there was an excess of value approaching $50,000,000 in 1934 as a result of the high capitalization rates developed from the five test companies in 1934. I also believe that there was an overstatement of value in 1934 on account of the Service Corporation's use of 9% in adjusting electric depreciation. The amount is speculative as is the amount by which the Service Corporation overvalued the Ageco service companies.

It is probable, therefore, that the Service Corporation's values are at least subject to deduction of from $50,000,000—$90,000,000 plus a substantial sum for the Service Companies in 1932 and are subject to deduction of from $80,000,000—$110,000,000 plus a substantial fund for the service companies in 1934.

Of course, all these figures are approximations and are duplicatory in the sense that the basis upon which they are calculated changes when any corrective adjustments are made. I believe they are im-

pressive, however, and if considered along with the fact that the Service Corporation's predictions were excessively optimistic in general, they demonstrate that the Service Corporation contributes to the notion that Ageco was insolvent at both dates.

As I have stated before, Hartt assigned values of $284,397,007 for March 31, 1932 and $56,050,803 for August 31, 1934. In my opinion his figure for 1932 represents the maximum value that could be assigned for the property. Indications were at that time that conditions would get worse before they improved. I think that the Service Corporation's work somewhat corroborates Hartt. Its report suggests a range of value from $280,000,000 to $300,000,000 for the properties in 1932. Hartt's figure for 1934 might be improved upon by reason of the fact that trends of business suggested a slight improvement at that time and because some sort of value, in excess of the hindsight value he added, might be found for the 55 companies without income. It is difficult, however, to conceive of much being added to his total.

The plaintiff offered certain facts for the purpose of confirming Hartt's demonstration of insolvency. I feel that none of them are too valuable in this connection.

The security market appraisal shows the poor regard that the public had for the Ageco securities in 1932 and 1934, but has very little significance in demonstrating fair value. Most everybody agrees it is an inadequate test, and I conclude that its probative value is so slight that I shall attribute to it only the merest force in this regard.

■ The plaintiff offered certain testimony and exhibits in connection with matters some years after the appraisal dates. Wedel, Thorp and Jackson contributed to this proof. The purpose of the proof was to show that Ageco had such a poor history after the valuation dates that it must have been insolvent in 1932 and 1934. All this has been elaborated on heretofore. I have indicated what I thought of Wedel's testimony. I believe Thorp's and Jackson's stands in the same light. It is true that Ageco is now insolvent and undoubtedly

was so at the time the Chapter X proceedings were commenced in 1940; and by a wide margin at both times. But is it also true that evidence of insolvency in 1940 and 1945, when Thorp valued the estate, is probative on the question of insolvency in 1932 if coupled with evidence of no substantial change in the interim? I think not, and the plaintiff's authority for such a proposition is meager indeed. It consists of one case, Baily v. Hornthal, 154 N.Y. 648, 49 N.E. 56, in which the Court of Appeals said that "While there is no presumption that the firm was insolvent in April because its successor failed in November, the difference between the assets and liabilities at the latter date was so overwhelmingly large as to require explanation, * * *. No sudden or unusual depreciation in the value of merchandise was shown. * * * While the evidence did not compel, it permitted, the conclusion that, if the affairs of the limited partnership had been wound up at the date of dissolution by any reasonable process of liquidation, there would not have been assets sufficient to meet the liabilities." 154 N.Y. at pages 656–659, 49 N.E. at page 59.

The period in the Baily case extended eight months while the periods in suit involve a minimum of six years and a maximum of thirteen years. There were many changes in the Ageco system throughout the intervening years. Undoubtedly, they were not so substantial as to account for the great decline in value of the System. But I can find no precedent which places that burden upon one to show intervening circumstances which might have caused a change in assets and liabilities where the period is so extended as here.

■ In fact it generally appears to be the rule that no inference of insolvency at a prior date arises from a subsequent adjudication in bankruptcy. Liberty National Bank v. Bear, 265 U.S. 365, 44 S.Ct. 499, 68 L.Ed. 1057; Arkansas Oil & Mining Co. v. Murray Tool & Supply Co., 8 Cir., 1942, 127 F.2d 564. Whenever the Courts have been inclined to make some judgment respecting prior insolvency the interval be-

tween the dates of the challenged transaction and bankruptcy are very short.[17] Here the periods are in excess of anything that was ever suggested in the cases and, I conclude therefore that the proof is immaterial.

The defendant points out some factors in support of the solvency of Ageco.

One involves the decision of Mr. Justice Schmuck, Rabenold v. Associated Gas & Electric Co., 1933, 148 Misc. 507, 266 N.Y.S. 520, in which he stated that the solvency of Ageco was beyond speculation. This finding was made in denying a motion for a temporary injunction to restrain the carrying out of the Recap Plan and was based solely on affidavits. It has very little significance. See Judge Leibell's comments concerning it in his opinion on the Plan of Reorganization, In re Associated Gas & Electric Co., D.C., 61 F. Supp. 11, 29.

A second factor involves the dismissal on January 12, 1937 of a proceeding under Section 77B of the Bankruptcy Act, commenced June 7, 1934; In re Associated Gas and Electric Company. The dismissal was upon the consent of the petitioning creditors pursuant to stipulation providing for many reforms in the operation of the System. In effect it was no more than a voluntary arrangement. In 1936 Messrs. Peat, Marwick, Mitchell & Co., independent certified public accountants, who were employed pursuant to the stipulation concluded that " * * * the debtor upon said consolidated basis would be able to earn its consolidated fixed charges by a substantial margin, providing a cushion of safety, without obtaining a reduction in principal or interest or an extension of time for payment thereof * * *." But the accountants were instructed to exclude from income various items such as amortization of debt, discount and expenses of Ageco and Agecorp, new business expenses in excess of the average of such expenses for the past five years, expenses of the Recap Plan, expenses incident to the op-

position of the enactment of the Public Utility Holding Company Act and numerous other expenses. Had these been considered the picture might have been different. Aside from these facts, I fail to appreciate the worth of the proceeding as evidence of Ageco's solvency in 1932 and 1934 any more than the plaintiff's evidence of subsequent events. There might be more logic in giving it weight, but I feel that the nature of the thing is not calculated to contribute much to the main issue.

I arrive now at the second paramount issue in the case and that is whether the defendant knew or was charged with knowledge that Ageco was insolvent or in imminent danger of insolvency, in 1932 and 1934.

The plaintiff's case on this issue consists principally of the testimony of the officers of defendant and of documents in the possession of the defendant.

On August 31, 1931, the following was stated in a memorandum of the Investment Service Department of the Bank: "We consider that, with the funded debt and the stocks of the subsidiaries outstanding to an amount in excess of five times operating revenues, about all of the reproduction value of the properties has been thus capitalized. The junior securities do not have any substantial liquidating value in case the system should get into difficulty."

On December 24, 1931, the Investment Service Department made a report to the Trust Department containing the following: "These unsecured debentures following approximately $261,000,000 of senior securities represent a type of holding company issue too far removed from the earnings source to warrant a conservative rating. * * * Associated Gas and Electric Company debentures as a class anticipated by several months the recent decline in the bond market and it is doubtful whether even in a generally advancing bond market these issues would reach high-

---

17. See, for example Williams v. Plattner, D.C.E.D.N.Y.1931, 46 F.2d 467, four to six days; Brown Shoe Co. v. Carns, 8 Cir., 1933, 65 F.2d 294, twenty days; Irving Trust Co. v. Roth, D.C.S.D.N.Y., 1930, 48 F.2d 345, one month.

er levels as quickly as other holding company obligations. We consider this issue an unattractive speculating holding obviously unsuitable for trust fund investment."

On November 21, 1932, Place, in his report on Ageco to Aldrich said:

"At the beginning of 1932 the Associated Gas & Electric System had maturities and top company debt as outlined in Exhibit No. 3, amounting to more than $47,000,000. Due to the extraordinary and, one might even say, unprecedented conditions existing in the security markets during the early months of 1932, normal channels through which these maturities could be financed, presuming them to be entitled to refinancing, and in this case they were, were closed to the Company.

"It is not overstating the fact to say that early in this year many competent people with knowledge of the requirements of this System and in view of the then existing security conditions, regarded the task of meeting these maturities as extremely difficult and, in the event that strong banking support was not fully forthcoming, an almost impossible one."

On February 11, 1932, the Trust Investment Committee approved the sale of certain convertible bonds (4½s of 1949) of Associated held in a trust fund.

A memorandum of Love, dated April 7, 1932, contained the following:

"Memorandum re Associated Gas & Electric Co.

"Meeting between Messrs. McCain, Aldrich, Addinsell, Macomber and Love held today. It was decided that if requested we would renew the Associated Gas & Electric loan due on April 18th, now on our books for $2,950,000, for 90 days provided the loan was collateralized to our satisfaction and that we had a special lone agreement with acceleration clause covering defaults of top company or any of its subsidiaries."

On April 11, 1932, Conovich of the Public Utilities Department of defendant sent the following memorandum to Love:

"Mr. Steinkamp of the Credit Department advises us that he is informed by the Graybar people that certain operating subsidiaries of the above have become slow in meeting their trade debts. The companies specifically mentioned are:

"Staten Island Edison
"Elmira Water & Light
"Rochester Gas & Electric
"New York Central Electric
"New York State Gas & Electric
"Empire Gas & Electric

"Mr. Steinkamp advises that he checked the above information with Mr. Lyles of Chase Harris Forbes who admitted that it was probably true that these companies have become slow in meeting their payments in order to conserve cash resources though their latest statements indicate them to be in fairly good condition."

In a letter dated April 12, 1932, the Investment Service Department of defendant wrote to the vice-president of the Wilbur National Bank, Oneida, N. Y., in part as follows: "The company has a sizable amount of bank loans to provide for while various subsidiaries must meet rather substantial maturities during the next several months and the unsettled conditions prevailing in the security markets tend to make financing operations rather difficult. This factor, together with the remote position which these debentures occupy in relation to the source of earnings, introduce considerable in the way of speculative elements, and the issue in question can not be considered a desirable holding at the present time. Coupons due April 1 last, on this issue were paid promptly, but predictions as to future payments are hardly possible."

A memorandum from the Business Development Department of defendant to Love, dated May 10, 1932, stated as follows:

"Associated Gas and Electric Company,
"Associated Gas and Electric Corporation.

"This is merely to post you that balances in these accounts today are substantially the same as when we referred them to you a few days ago: $626,000 and $50,000— against a loan of $2,950,000 now past due.

(Balances in the Company account alone averaged $2,557,100 last year.)"

The next day the same Department sent another memorandum to Love:

"Associated Gas and Electic Company

"The opening balance in this account this morning was $566,000. We received credits of $2,415,000 consisting of the company's own checks on other banks which increased the balance to $2,981,000. The Bookkeepers have been requested by the Loan Department to hold out $2,950,000 for payment of their loan. This brings their balance down to $31,000.

"This is merely for your information."

On December 16, 1932, after consultation with others at the Bank, including Aldrich, Love wrote Place in connection with the latter's report:

"While we concur in certain opinions expressed in the report, we cannot concur with the conclusions of the report regarding the earning power of the System, without knowing whether the findings in the report were based upon a study of the detailed income statements of the operating companies showing separately maintenance, depreciation, credits to operating expenses which have been charged to construction, and credits of interest during construction and on undeveloped properties; also a consolidating schedule carried up to the top company with full details of all inter-company eliminations, including inter-company power sales as well as all other inter-company transactions and profits.

\*     \*     \*     \*     \*     \*

"Obviously, without the foregoing information one would have difficulty in arriving at any accurate conclusion as to the status of any public utility holding company or system. We have discovered from experience that the things to look out for are the things which do not appear on the surface and, as there has been so much skullduggery in consolidated and so-called corporate balance sheets we are skeptical of holding company figures without a complete disclosure of the facts enumerated in the above paragraphs. It may be that all of the foregoing have been made available to you and that your conclusions are based on a study of these facts."

On May 15, 1933, the Recap Plan was announced. In the letter of announcement which the defendant received, it was stated:

"For the twelve months ending March 31, 1933, the fixed interest charges of this Company were $12,388,094.98. For the same twelve months' period, the consolidated net earnings of this Company and its subsidiaries, after depreciation and after all charges of subsidiaries, were $14,801,844.67—only $2,413,749.69 in excess of the fixed interest charges of this Company. How long interest can continue to be paid depends primarily upon the trend of business, freedom from additional tax burdens and rate reductions, and ability to finance future cash requirements.

\*     \*     \*     \*     \*     \*

"While the Company may be able to meet debenture interest if general conditions do not become decidedly worse, the dangers of fixed interest securities in times like these are becoming more and more apparent. Receiverships and forced reorganizations, with all their attendant expenses, discontinuance of all interest payments and loss of operating efficiency, with delays and contests of rival committees, must necessarily follow if fixed interest charges are not met."

On May 29, 1933, the Investment Service Department of defendant sent defendant's Trust Department the following "confidential" report stating in part as follows:

"Earnings continue to show substantial declines and for the twelve months ended March 31, 1933, consolidated charges were barely covered \* \* \*.

"Pending the outcome of the company's present attempt to exchange its debentures as briefly outlined above, it is difficult to clearly establish the probable status of these bonds. They practically represent the equity in this large holding company system and as such are exclusively speculative although probably worth substantially more than indicated in the present market Low Grade."

On November 20, 1933, a report to the Trust Department, a copy of which was received by Love, stated in part: "Conclusion—the continuation of interest payments

on these bonds depends upon the various factors briefly mentioned above together with the outcome of the present plan of recapitalization. Some doubt arrives as to the company's ability to obtain cash dividends from its operating properties owing to certain restrictions, etc."

A memorandum from defendant's files, dated October 27, 1933, related information supplied by Burroughs of Ageco to the defendant's Public Utilities Department including:

"He also gave the following estimates of additional costs to be expected during the next twelve months:

| | |
|---|---|
| Rate reductions ordered or expected to be ordered by the first of the year | $1,500M |
| Capital Stock Tax | 1,000M |
| 3% Gross Sales Tax | 1,100M |
| Additional cost due to N.R.A. | 1,250M |
| Expected increase in cost of materials | 1,000M |
| Total | $5,850M" |

A memorandum dated December 6, 1933, from the Investment Service Department to Place stated:

"Assuming that advantage is taken of the periods of grace, what are the chances of the company remaining solvent during the year 1934?

| | |
|---|---|
| Cash requirement top company debt | $9,434,000 |
| Takeable cash using estimate of Mr. Love's Department | 6,800,000 |
| Indicated Cash Deficiency | $2,634,000 |

\* \* \* \* \* \*

"It would therefore appear that the chances of the company avoiding actual default during 1934 are substantially better than even. The management of the company has more than a full year in which to work on the plan and undoubtedly will succeed in increasing substantially the amount of deposits under the plan."

Circular letters sent out by the Associated System and found in the files of the Bank contained the following:
(April 16, 1934)

"In keeping with our policy of advising security holders of conditions confronting the Company, we must call your attention to unfavorable developments which have arisen since the enclosed advertisement was published. We refer in particular to a drastic program of public utility legislation which recently passed the upper branch of the New York State Legislature.

\* \* \* \* \* \*

"Another bill would authorize the reduction of rates to a point which would give operating companies a return of only 5% of the original cost of their property, less accrued depreciation. Similar legislation is proposed in other states in which subsidiaries of the Associated Gas and Electric System operate."

(April 26, 1934)
"To Investment Security Dealers

"In the interest of your remaining clients who hold fixed interest debentures of Associated Gas and Electric Company, we wish to point out to you again the declining margin of consolidated earnings of the Associated Gas and Electric Company and subsidiaries after prior charges as shown by its published statements:

| Twelve Months Ended | Consolidated Earnings After Prior Charges | Interest Charges on Company Debentures | Balance |
|---|---|---|---|
| Dec. 31, 1932 | $16,784,624 | $12,366,103 | $4,418,521 |
| Mar. 31, 1933 | 14,801,844 | 12,388,095 | 2,413,749 |
| June 30, 1933 | 13,495,441 | 12,438,760 | 1,056,681 |
| Sept. 30, 1933 | 13,077,638 | 12,120,506 | 957,132 |
| Dec. 31, 1933 | 8,149,380 | 11,397,504 | 3,248,124 (Deficit) |

"These figures do not reflect the full amount of interest savings which will ultimately be realized as a result of deposits of debentures already received under the Plan, but neither do they give full effect to the burdens of increased taxes, NRA expenses and the so-called emergency rate cuts which have become effective since the Plan was announced.

"In addition we call your attention to the further dangers of the program of public utility legislation, unfair and injurious to public utility investors, that has just been forced through the New York State Legislature, none of the probable effects of which are reflected in the above figures. Two of these acts alone, permitting municipal competition and drastic forced rate reductions, may have far-reaching consequences.

 *  *  *  *  *  *

"The recently enacted New York State legislation and similar proposals pending in other states remove all question as to the necessity of the Plan if any has heretofore existed. This legislation is admittedly aimed at the holding company; in fact, many of its leading proponents are exulting predicting that its application, by drying up the earnings of operating companies, will bring about a complete destruction of holding companies and all values in their securities issued in 1928 and 1929. The basis for their belief is apparent from the summary of several of the more important bills which appears on the reverse side of this letter."

(April 28, 1934)

"We urge your immediate attention to the proposed 1934 tax bill, pending before Congress in Washington, which, if passed in its present form, will surely have most disastrous consequences to security holders.

"This bill contains a proposal to deprive corporations of their right to file consolidated income tax returns. This provision, if enacted into law, will, it is estimated, require an additional cash outlay of over $3,000,000 by the Associated System and will bring its annual tax expense for 1934 to over $12,000,000. To holders of Associated System securities, this means $3,000,000 less available cash for the payment of interest."

A report from the Investment Service Department to the Trust Department, dated May 17, 1934 contained the following:

"The company is still under investigation by the Federal Trade Commission. Unfavorable publicity has been occasioned by the Thayer inquiry at Albany and General Gas and Electric Corporation, controlled by Associated is now faced with a suit for receivership. The recently passed Lehman Bill will affect the earnings of properties in New York State so that rate reductions are expected. The Associated System reports that it is facing additional expense as a result of their inability to file a consolidated income tax return under the new tax laws.

 *  *  *  *  *  *

"The continued payment of interest on the undeposited bonds of the Company depends entirely upon the trend of earnings, together with the ability to bring cash through the operating units. With the prospect of lowered rates and additional cash expenses for taxes, together with the fact that certain properties are unable to pay dividends, or if so in only small amounts compared to earnings, the immediate outlook is extremely speculative. Low grade.

 *  *  *  *  *  *

"Approximately $135,000,000 of debentures of Associated Gas & Electric Company have been deposited under one of the three options provided in the Exchange Plan. Interest savings resulting from this exchange are approximately $2,800,000, and if earnings continue to improve and the company is not forced into receivership by some means, there is a possibility that some value will accrue to these junior Securities."

In June, 1934, a proceeding under Section 77B of the Bankruptcy Act was commenced against Ageco. The negotiations which eventually resulted in the exchange of securities began sometime between the Fall of 1933 and the Fall of 1934.

On June 11, 1934, Love received a report from Robinson, an engineer in his

Department, discussing the securities which were the subject of the proposed exchange. He wrote the following about Ageco:

"Associated Gas & Electric Company 4½% Debentures of 1949 ($4,249M)

"An analysis was made of this Company about a year ago (April 30, 1933), at the time the Company was promulgating its Plan for the re-adjustment of its capitalization.

"At that time our pro forma earnings statement development from Company figures indicated $13,275M available to service $12,585M Debenture interest, leaving a balance of $690M before any adjustments were made. After an estimated increase in depreciation accruals of $2,-800M, a deficit in earnings for debenture interest of approximately $2,100M was indicated. Estimated requirements for new construction, extraordinary maintenance, etc. resulted in an indicated cash deficit of about $5,750M after debenture interest.

"Since that time the Company's comparative statements for the succeeding year indicate the following changes:

Net Operating Revenues have declined about ................ $4,250M
Prohibition of consolidated income tax returns will increase expenses about .................... 2,500M
_____
$6,750M
Exchange of debentures under the Plan will produce estimated annual interest savings of........ 2,750M
_____
Net decrease in Earnings........ $4,000M

"Applying this net decrease of $4,000M to the figures developed in last year's analysis results in a deficit before any adjustments, of approximately $3,300M and after the depreciation adjustments, in a deficit of $6,100M. The results of the past year's operations indicate that the estimate made last year of requirements for new construction and extraordinary maintenance were somewhat too high and it is estimated that the company's cash deficit will probably not exceed its earnings deficit this year.

"In considering this deficit, it should be borne in mind that the period covered includes only 6 to 9 months of the higher labor and material costs due to N.R.A. and of Federal Gross Revenue Taxes. While it also includes a period of increasing business activity, it is impossible to determine whether this will be sufficient to offset the effect of these increases in costs and possible additional rate reductions."

The plaintiff submits that all this evidence and inferences drawn from testimony of the defendant's officers prove conclusively that the defendant knew of Ageco's insolvency, or that it was sufficiently apprised of the facts to be charged with such knowledge.

The defendant views the situation differently, of course. It points to the fact that it made Ageco a $4,000,000 unsecured loan on October 16, 1931. Obviously, it could not have had a feeling of Ageco's critical financial difficulties at that time. What occurred, therefore, in the period from October 16, 1931 to May 11, 1932, when Ageco made the final payment on the loan, to inform the defendant of Ageco's insolvency? Nothing significant to my mind. The defendant knew that Ageco had paid most of its bank loans and a substantial portion of its other short-term debt by the end of April, 1932 and that by May 11, 1932 it had paid all of its bank loans except $10,000 including some maturing later than the defendant's. In fact, the defendant evidenced a willingness to renew the loan in April, 1932, for 90 days if properly collateralized. See Love's memorandum of April 7, 1932. If the defendant was aware of Ageco's insolvency at that time, I think it would have been disinclined to have any further dealings with Ageco. Of course, it might have obtained collateral from Ageco unrelated to the System and so would not have suffered from insolvency. If the defendant accepted System collateral it would have suffered. And System collateral was offered which the bank rejected solely for the reason, apparently, that the securities offered were worth only $1,800,000 in the current market, an amount substantially less than the loan. The fact that the de-

fendant declined such securities only because of their value leads me to the inference that it would have accepted System securities if they were of sufficient worth to cover the loan. In this event the bank would have displayed something less than wisdom in accepting securities of a System known to it to be insolvent. Further, around that time, the defendant took under consideration a loan of approximately $7,500,000 to the Staten Island Edison Company, an operating subsidiary of the System, which Hopson had applied for. Would the defendant have evidenced the slightest interest in this transaction if it knew Ageco was then insolvent? The answer is obvious.

The proof in connection with the defendant's knowledge of insolvency in March and May, 1932 falls far short of proving such knowledge when all the circumstances are considered. The statements of the defendant's Investment Service Department must be considered in the light of its function to assemble data necessary for formulating opinions about securities, to answer inquiries respecting securities and to characterize them as to their investment qualities. Love was abreast of the situation with Ageco, probably more so than others in the bank, and his actions demonstrate that he believed Ageco to be solvent. He testified that he had no doubt of the solvency of the System at that time and that his interest concerned the ability of the System to finance rather than to remain solvent. I believe all the circumstances tend to confirm his testimony.

■ I hold, therefore, that plaintiff has not carried the burden of proving that defendant knew that Ageco was insolvent, or in imminent danger of insolvency, in March and May, 1932.

By August 31, 1934, Ageco's condition had worsened, or, at least, there was some evidence of such a condition.

The defendant had had the benefit of Place's report in November of 1932. Although the plaintiff uses it as evidence against the defendant, I believe on the whole that it is beneficial to the defendant's case. Place's remarks, previously quoted,

with respect to Ageco's task of meeting the maturities of more than $47,000,000 of securities are followed by his comments respecting its efforts:

"* * * In spite of the unique conditions existing in the security markets and the failure to secure the measure of banking support which might reasonably have been expected, the management of Associated Gas & Electric Company succeeded in taking care of all the above mentioned $47,-000,000 of maturing obligations. It has maintained throughout its interest charges and as of September 30, 1932 after having provided for all the maturing obligations except those indicated on Exhibit 4, the parent company had no bank loans; loans throughout its controlled companies amounted to $9,682,485, and cash in the System amounted to $9,209,315.

"Regardless of what may be said about the wisdom of having issued short term notes a year ago, the maturities of which to a great extent constituted the crisis herein referred to, it must be conceded that the ability of the management to meet the crisis with which it was confronted under most difficult circumstances, was little less than remarkable. Regardless of whether one likes the management or one doesn't or whether one has specific criticisms against it or not, the driving vitality and resourcefulness of this management under most trying conditions must be conceded. * * *"

Place summarized his conclusions in the memorandum transmitting the report: "I think that a reading of the attached report will bring one to the conclusion that, with the exception of the management problem presented by Mr. Hopson, the system is intrinsically sound and, as it stands today, well financed, and that its securities, other than the mortgage securities of the subsidiary holding companies, are selling at prices radically below where they should sell compared with other similar holding company securities."

Stix, who was in charge of Ageco's accounting in 1932, furnished Place and his assistants many of the figures upon which Place's report was based. Included in the information furnished were certain consolidated balance sheets of the System as at

July 31, 1932. One of these balance sheets set forth separately the "excess on securities held inter-corporately" and also disclosed the revaluations or "write-ups" of fixed capital in the Associated System. The plaintiff asserts that it would be clear to one with some knowledge of accounting that the aggregate fixed capital of the Associated operating companies per books and before write-ups was insufficient to cover Ageco's debentures. This assertion is made in response to the defendant's reliance upon the books of Ageco as showing solvency.

Stix' figures showed the capital of Ageco on a consolidated basis to be $499,530,333.45 in 1942. The "excess on securities held inter-corporately" was $185,176,415.75 and the "increase in fixed capital from adjustment of book fixed capital to reproduction cost new less depreciation" was $104,342,-908. Deducting these two figures results in a reduction of Ageco's capital to $210,-011,009.70, an amount insufficient to cover Ageco debentures. The first figure deducted represents the excess in the price paid by Ageco or its sub-holding companies for the stocks of a subsidiary operating company over the equity in the physical plant of the properties as shown by their books. The second figure deducted resulted in this fashion. An appraisal of the physical properties, including "overheads" or intangible items was made including an estimate of observed depreciation. Hopson and Daly substituted the Brooklyn Borough overheads, which in every instance except one were larger than the original. The resulting figures represented reproduction costs which were in excess of book figures. The excess was called "excess of reproduction cost over book cost" and was entered on the assets side. A comparison of observed depreciation with book depreciation resulted in the "excess of reproduction cost, depreciation over book cost depreciation" and was entered on the liability side as "capital surplus B". This capital surplus B, resulting from the write-up, was added to the book equity of the stock of the operating company, thereby reducing the excess of carrying value of that stock on the books of the holding company over its book value on the books of the operating company.

The plaintiff admits that as a matter of accounting the "excess" is properly included as an asset in the consolidated balance sheet. Stix believed so, too, and said the deductions were unjustified, and that he made them only because of counsel's instruction. The plaintiff argues, however, that the defendant should have disregarded accounting convention and looked at the reality behind that convention. Evidently his "reality", even though he disavows it, is based upon what the books show. I do not believe that anyone ever places great reliance on book worth as a test of fair value. It is true that book worth has a relationship to fair value in the case of utility operating companies on account of the substantial weight given to original cost in fixing rates. But there is no way of knowing, except possibly by hindsight, whether the amounts paid for the operating companies were nearer their fair value than the book worth or vice versa. And there is also no way of knowing whether the write-ups brought the book values nearer fair value or not. Love understood the significance of excesses and write-ups, and he admitted that such a situation as the consolidated balance sheet of July 31, 1932 would put a skilled analyst on inquiry as to all the facts. He paid his respects to such balance sheets in his response to Place's report.

My feelings about the consolidated balance sheets of July 31, 1932 are akin to Love's. I believe that the bank was somewhat suspicious of these excesses, but it was years later before the true picture was obtained. I do not feel, however, that they suggested the thought of insolvency to the bank. Rather, they were more likely to arouse the bank's curiosity from the standpoint of any business risk that the bank might contemplate taking. I infer this from the feeling around the bank that Ageco was in fairly good condition considering the times. Place had noted: "We have gone over the consolidating figures relating to the balance sheet and the earnings for the year ended December 31, 1931 and for the

12 months period ended July 31, 1932 and have satisfied ourselves that these consolidating figures are properly made up and that there is nothing in them which improperly reflects the true position and earnings of the system. We have, moreover, in connection with the year ending December 31, 1931, had the benefit of discussions with Haskins & Sells, who have just completed their audit of the entire system for that period, and have been told by them that their audit and their check discloses no substantial differences from the actual company figures which were published in the 1931 annual report. We expect shortly to have their certificate in confirmation of this assurance. Our discussions with Haskins & Sells confirm the opinion previously developed by us that the accounting procedure of the company is proper and honest."

On May 15, 1933, the Recap Plan was announced and the bank received the literature in connection with it. Love thought that Ageco's gloomy forecasts were mere "high pressure stuff" designed to stimulate response to the Plan. Love believed that Ageco had a source of income in addition to dividends and also of cash in the form of liquidation of debts running to the top company. At the time and later there were discussions relative to the legality of the Plan and Love thought that Ageco was probably solvent and that it would be a "perfectly fantastic job if we ever got into litigation" to prove it was not, and might involve a field audit. Aldrich thought that it might pull through or might not, depending upon the success of the Plan. Defendant did not deposit under the Plan and advised others of its opinion that "under all the circumstances there is not sufficient incentive from the standpoint of a debenture holder to warrant his consent to permanent relinquishment of his contract rights and for that reason we have not deposited our debentures under the Plan." It seems to me that if the bank had been infected by Hopson's alarm it would have jumped at the opportunity to save itself and its customers. Evidently it felt that the "contract rights" that it had were worth something and there isn't any thought expressed that the defendant feared the bottom was dropping out of Ageco.

Defendant knew that an attack had been made against the Recap Plan in 1933 and that it had been upheld in August of that year by Mr. Justice Schmuck who found its "solvency beyond speculation." Of course, this represented a superficial view of the matter, as I have indicated heretofore, but it was undoubtedly more comforting than disturbing and certainly more confirming than conflicting to the bank. This decision entered into the defendant's determination not to litigate over the Recap Plan.

Meanwhile the bank was receiving reports of substantial declines in earnings and of additional costs being imposed. The Investment Service Department thought that "the chances of the company avoiding actual default during 1934 are substantially better than even." In April of 1934 the circular letters put out by the Associated people had critical overtones. Novel circumstances were contributing additional burdens. The Investment Service Department of the bank took note of these factors in a report to the Trust Department.

In May, 1934, the petition under Section 77B of the Bankruptcy Act was filed against Ageco, alleging its insolvency which the company denied. Love said that he still believed the company was money good; that the assets were enough to satisfy the underlying securities of both companies, Ageco and Agecorp. At this time Ageco was notifying debenture holders of the proceeding and urging deposit under the Recap Plan " * * * to prevent any disruption of its properties * * *." A telegram received at the bank for one of its customers bore the pencilled notation:

"Talked to Richards—Inv. Service Dept. on this. He says his dept. is advising noncompliance on grounds that undepositing holders of company bonds will probably fare as well as depositing holders in any change of set-up and in meantime will get interest. The Co. has announced that interest will be paid July 15 on the 4½s of 1/15/49.

"Do nothing."

Love testified that he had discussed the general set-up of the Associated System from time to time, not necessarily at the time of the 77B proceeding, and that he had generally considered the position of System debentures in the event of bankruptcy, reorganization or receivership. He seems not to have been apprehensive about any of those conditions occurring, however.

Love had the benefit of Robinson's report in connection with the exchange of the securities which did not paint a pleasant picture. He said that he had no reason to doubt that he agreed with Robinson's figures except as to construction estimates.

It is plain that Ageco's financial plight was more apparent in 1934 than in 1932. And the defendant was aware of it. But do all the circumstances warrant a finding that the bank knew Ageco was insolvent at the time of the exchange of securities? I feel that they do not. Of course, the bank knew that Ageco's condition was worsening but so was everyone's in those critical days. Ageco had weathered every storm. It had never defaulted in an obligation and did not in fact until 1940. It had gotten a favorable decision in the action before Mr. Justice Schmuck. Certainly the bank was not too overwrought by the Section 77B proceeding. Ageco's books showed the company to be solvent in 1932 even though the "excesses" were speculative.

Under all the circumstances, I cannot regard the plaintiff's proof as carrying the burden imposed upon him. It does not convince me that the defendant knew that Ageco was insolvent or in imminent danger thereof on August 31, 1934.

A further phase of this question is whether the defendant is to be charged with knowledge of Ageco's insolvency in 1932 and 1934.

In preference cases under the Bankruptcy Act, the rule is settled that if the creditor has reasonable cause to believe that the debtor is insolvent and in fact the debtor is, the creditor is obligated to restore the preferential payment. Notice of facts which would lead a man of ordinary prudence to inquiry is notice of all the facts which a reasonably diligent inquiry would have disclosed and it is immaterial then what the creditor believed. Pender v. Chatham & Phenix National Bank & Trust Co., 2 Cir., 1932, 58 F.2d 968; In re Star Spring Bed Co., 3 Cir., 1930, 265 F. 133. Mere suspicion of insolvency, however, is not sufficient to put the creditor on inquiry. In Grant v. National Bank, 97 U.S. 80, 24 L.Ed. 971, the Supreme Court remarked: "Some confusion exists in the cases as to the meaning of the phrase, 'having reasonable cause to believe such a person is insolvent.' Dicta are not wanted which assume that it has the same meaning as if it had read, 'having reasonable cause to suspect such a person is insolvent.' But the two phrases are distinct in meaning and effect. It is not enough that a creditor has some cause to suspect the insolvency of his debtor; but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure."

And in Bassett v. Evans, 8 Cir., 253 F. 532, 535, it was stated: "Thus between actual knowledge and actual belief, on the one side, and fear and suspicion, on the other, lies the 'reasonable cause to believe' mentioned in the section. This classification, however, is not as helpful in the decision of a concrete case as it appears. Fear and suspicion of insolvency, if they be strong enough, become belief, and the difficulty with the classification is that there are no criteria by which it can be said that one set of facts ought to engender fear or suspicion only, while another set of facts furnish reasonable cause for belief. It is impossible to group the ever-changing facts of business life into hard and fast categories, and say that one category produces fear, another suspicion, and another belief."

Undoubtedly, the defendant had notice of facts which would lead a man of ordinary prudence—a bank, at least—to make inquiry. In my view of the facts it did. It appeared to be doing its utmost at all

times to ascertain the condition of Ageco. The plaintiff suggests that the bank's officials were following the situation like a hawk and knew as much about it as anyone except Hopson and his close associates. If that is true then the bank knew all that a reasonably diligent inquiry would have disclosed. How much further should the defendant have gone to be "reasonably diligent?" It had examined the Ageco books, had reports on income, new expenses and the like. Some of the information forebode more critical times. But there was no real way in which the defendant could have discovered Ageco's insolvency short of a valuation such as was made here. Then the excesses and write-ups, future income, new expenses, depreciation and maintenance and all the rest of the picture would have been disclosed. I do not think anyone can say the bank had such a duty imposed upon it. It would have been unreasonable considering the time and expense consumed and still the investigation might not have disclosed insolvency, and might not have turned up any more than what was presently known. This doubt may be inferred from the fact that the task was not simple to the parties involved in the proceeding before Mr. Justice Schmuck and in the Section 77B proceeding.

I do not believe that the bank was put on such notice that it was obligated to go further than it did by reason of the fact that it was an indenture trustee. I believe it discharged its duties properly enough for any capacity in which it may have acted.

The Associated System was a vast utility empire. Defendant's officers, aware of the perilous times, were alert and were watching the situation closely. To sum it up, I believe that while they did not trust Hopson fully they actually and honestly believed that the System was sound and would pull through.

Even now after careful, prolonged and extensive study by two sets of experts there is a diversity of opinion as to the solvency of Ageco on the dates in question.

■■■ I hold that the defendant is not charged with knowledge of Ageco's insolvency in 1932 and 1934.

The plaintiff next contends that since defendant knew that Ageco was in bad financial condition in March and May, 1932 and in August, 1934, and since Ageco thereafter became insolvent, defendant is liable to make restoration whether or not at the time of the taking Ageco was in imminent danger of insolvency.

I *have* found that Ageco was insolvent at both necessary times. Since plaintiff's argument is premised upon an assumption of insolvency occurring later than August 31, 1934, it must be considered in a slightly different light.

The plaintiff uses an unhappy adjective in this argument. I refer to "bad." I am sure that the defendant knew that Ageco was in a bad financial condition in 1932 and 1934. The question is how "bad"? I have already found that Ageco was not, to defendant's knowledge, "bad" enough to be insolvent or in imminent danger of insolvency. The query, then, is whether Ageco was in a sufficiently bad financial condition, to defendant's knowledge, to render the defendant's actions perilous.

■■■ Remember that the defendant was an indenture trustee, so that it could not favor itself over the debenture holders for whom it was a fiduciary. See Clarke v. Chase National Bank of City of New York, supra, 137 F.2d at page 801. But the only way in which the defendant could have favored itself over the debenture holders was by accepting benefits to the extent of depletion of the estate to which the debenture holders looked for payment. I think the facts belie any such finding of guilt upon the defendant's part. Certainly it was not wrongful to accept payment of its loan when it was due, and, of course, it was not wrongful to be in a creditor relationship with Ageco in the first place. The trust indenture permitted this. It was not apparent that the debenture holders for whom the defendant was trustee would not be paid and I do not think that they were obligated to conduct a valuation of Ageco's

assets merely to ascertain beyond a doubt that there was no possible peril in their actions.

The plaintiff's authorities, York v. Guaranty Trust Company, 2 Cir., 1944, 143 F.2d 503, reversed on question of limitations, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, and Dudley v. Mealey, 2 Cir., 1945, 147 F.2d 268, represent instances of conflicting allegiances on the part of indenture trustees who placed themselves in a position to profit as creditors to the detriment of the beneficiaries they were bound to protect. The situations to which these cases most nearly apply were ruled on by the Circuit Court before the trial of this case. Otherwise I cannot agree to their application unless it is wrong for an indenture trustee-creditor to accept payment of its loan when due and to enter into an arm's length exchange of securities at a time when the company for whose debenture holders it is trustee is experiencing finance difficulties common to many utilities of that day. I do not think the bank was wrong.

The defendant raises a point which deserves a few remarks and that concerns the so-called competition with the debenture holders and receipt of preferences. The Circuit Court stated: "Even though the absence of a res may make the word 'trustee' inapposite, Chase was at least an agent equally obligated to refrain from competing with its principals, the debenture-holders. * * * Upon receipt of preferences which were, as to the debenture-holders, a breach of its duty, Chase became a trustee for their benefit." 137 F.2d at page 801.

The defendant argues that it cannot be considered in competition with its debenture holders since the debentures for which it was trustee were not due until 1949 and 1958, respectively, and there had been no defaults in interest thereon. However, since the complaint does not allege that the debentures were due and since the Court of Appeals sustained the second and fourth claims for relief, it would appear that the law of the case is settled against defendant on this point.

The defendant further argues that it could not have received a preference if Ageco's assets as of March 31, 1932 and August 31, 1934 were sufficient to cover Ageco's funded debt because that was the category in which the debenture holders fall to whom defendant owed a duty, and it owed no such duty to creditors ranking below that level. I believe this argument has some merit but in view of the fact that the Court of Appeals has sustained the two claims for relief with insolvency alleged as their bases, I must treat the complaint in that light. It is significant, however, that under Hartt's valuation for 1932, the funded debt was covered, which funded debt could possibly be reduced by the determination of the proper rank of $37,000,000 of CDCs. In 1934, Ageco's funded debt was not covered according to Hartt.

The problem of the unfairness of the exchange of securities pursuant to the agreement of August 28, 1934 is rendered moot by my finding of the defendant's lack of knowledge of Ageco's insolvency, or imminent danger of insolvency, at that time. I do not think it would be wise to make a gratuitous finding of the value of the exchange securities merely to ascertain whether dollar for dollar was given. It might be a time saving finding of fact in the event a higher court takes a different view of matters, but I feel that it is better left undetermined.

I referred heretofore to the fact that the exchange of securities was not between subsidiaries of Ageco and Chase, as the complaint alleged, but was between subsidiaries of Agecorp and Chase. This point was raised in the Court of Appeals, and that Court obviously found that the plaintiff might maintain this claim. I shall not review it.

At the end of the case the defendant moved to strike various exhibits and testimony. Decision was reserved. I now deny such motion.

This disposes of every important point I believe.

Judgment for defendant.

Settle order.